637 So.2d 921 (1994)
John Bruce VINING, Appellant,
v.
STATE of Florida, Appellee.
No. 75915.
Supreme Court of Florida.
April 28, 1994.
Rehearing Denied June 23, 1994.
*922 James B. Gibson, Public Defender and Larry B. Henderson, Asst. Public Defender, Seventh Judicial Circuit, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen. and Margene A. Roper, Asst. Atty. Gen., Daytona Beach, for appellee.
*923 PER CURIAM.
John Bruce Vining, a prisoner under sentence of death, appeals his convictions for first-degree murder and armed robbery and the attendant sentences. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution, and affirm both the convictions and sentences.
On December 8, 1987, surveyors discovered the partially decomposed body of a woman in a remote grassy area in Apopka, Florida. The body was fully clothed in a two-piece dress, but no jewelry, purse or shoes were found. Through dental records, the woman was identified as Georgia Caruso. The medical examiner determined that death had occurred two to three weeks prior to the discovery of the body. The medical examination revealed a possibly fatal gunshot wound to the left side of Caruso's jaw and a fatal gunshot wound to her left temple. There were no signs of a struggle where Caruso's body was found, and it appeared that she had been killed elsewhere and transported to the grassy area.
In November 1987, Caruso had placed advertisements in several papers offering diamonds for sale. In response to those advertisements, a man met with Caruso at her fingernail care business, on November 13, 16, and 18, 1987. Caruso introduced the man to Joann Ward, a nail technician employed by Caruso, as "George Williams, a man interested in jewelry I have to sell." Ward described Williams as being in his fifties, five feet eleven inches tall, around 175 pounds, thinning light brown hair, long face, loose facial skin, and wearing a gold watch and glasses. On November 18, 1987, Caruso asked Ward to accompany her to meet Williams in order to have the jewelry appraised. According to Ward, Williams arrived in an older model black Cadillac Fleetwood with tinted windows, and Ward saw him use an inhaler/aspirator. Ward and Caruso followed Williams to the Winter Park Gem Lab. Ward ran errands while Caruso accompanied Williams to the gem lab.
Earlier in the day, Caruso had arranged for Ellen Zaffis and Kevin Donner, gemologists at the Winter Park Gem Lab, to appraise gems for a prospective buyer. Caruso arrived at the gem lab accompanied by a man that she identified as George Williams. Both Zaffis and Donner gave a description of Williams that was consistent with Ward's description. Donner appraised a 6.03-carat pear-shaped diamond and a 3.5-carat round diamond at a total value of $60,000.
After the appraisal, Caruso told Ward that Williams had decided to buy the diamonds and that she was going to accompany him to the bank to put the purchase money in a safe deposit box. Ward returned alone to work, and never saw Caruso again. Ward and Zaffis testified that when they last saw Caruso she was wearing a two piece dress, black shoes, black earrings, a gold Rolex watch, an anniversary ring, a solitaire engagement ring, the 6-carat pear-shaped diamond ring, and was carrying a black purse.
Pursuant to the Interstate Agreement on Detainers (IAD),[1] the Orange County Sheriff's Department placed a detainer against John Bruce Vining on May 5, 1989, eighteen months after Caruso's death. At that time, Vining was serving consecutive fifteen-year sentences for kidnapping and aggravated assault in Georgia. On June 5, 1989, the State of Florida charged Vining with the first-degree murder and armed robbery of Caruso.
The State's case against Vining was based upon circumstantial evidence. Zaffis and Ward identified Vining's picture as George Williams when shown a photographic lineup. At trial, Zaffis, Ward, and Donner also identified Vining as George Williams. Phone records indicated that two calls were made from Vining's residence to a diamond dealer who advertised in the same newspaper as Caruso, but that dealer refused to meet with the caller under circumstances similar to those requested in the instant case. Vining's phone number is 774-6159 and Caruso's personal notebook listed George Williams phone number as 774-6158. Vining used his mother's black 1978 Cadillac which was discovered burning in a rock pit in Marion County the day after the media reported the discovery of *924 Caruso's body. Phone records indicate that a call was placed to Vining's residence from a pay phone near the rock pit on the day that the car was burned. The day after Caruso disappeared, Vining sold a diamond that had been entrusted to Caruso for consignment. Vining also uses an inhaler/aspirator.
The jury convicted Vining of first-degree murder and armed robbery. Using a special verdict form, the jury also specified that Vining had committed both premeditated and felony murder. The jury recommended the death penalty by a vote of eleven to one. Again using a special verdict form, the jury found four statutory aggravating factors proven beyond a reasonable doubt: 1) the crime was committed by a person under sentence of imprisonment;[2] 2) the defendant was previously convicted of a felony involving the use of violence to the person;[3] 3) the crime was committed during a robbery;[4] and 4) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] The trial judge found the same statutory aggravating factors as the jury, found no statutory mitigating factors, and gave little weight to the nonstatutory mitigating factor of military service. The judge imposed a death sentence for the first-degree murder conviction and sentenced Vining as an habitual offender to life imprisonment on the armed robbery conviction.

GUILT PHASE
Vining argues that the trial court erred during the guilt phase of his trial by: 1) denying his motion to dismiss due to an alleged violation of the IAD; 2) allowing the State to present hypnotically-refreshed testimony; and 3) restricting defense counsel's questioning of prospective jurors during voir dire and denying valid challenges for cause.
Vining maintains that because he was not brought to trial on the charges within 120 days of his arrival in Florida under the IAD, his motion for discharge was improperly denied.[6] The State accepted temporary custody of Vining under the IAD on July 21, 1989, when an Orange County assistant state attorney agreed to accept temporary custody "in connection with an inmate's request for disposition of a detainer." Vining arrived in Florida on August 31, 1989. On January 10, 1990, Vining sought discharge based on violation of the IAD speedy trial time, but the motion was denied. On January 12, 1990, the State moved to extend the time for speedy trial and the motion was granted by the court on January 24, 1990. Trial commenced January 22, 1990.
Under the IAD, a prisoner in one participating jurisdiction may require the speedy disposition of charges pending against that prisoner in another participating jurisdiction when those charges provide the basis for lodging a detainer against the prisoner. § 941.45(3), Fla. Stat. (1987). The IAD also permits the jurisdiction which has lodged the detainer to request custody of the prisoner, but for any proceeding which is made possible by this subsection "trial shall be commenced within 120 days of the arrival of the prisoner in the receiving state." § 941.45(4)(c), Fla. Stat. (1987). If the action is not brought to trial within the time periods specified, then the court "shall enter an order dismissing the [indictment, information, or complaint] with prejudice, and any detainer based thereon shall cease to be of any force or effect." § 941.45(5)(c), Fla. Stat. (1987).
Vining contends that because the 120-day time limit provided by subsection (4)(c) began to run upon his arrival in Florida on *925 August 31, 1989, the trial court erred in denying his motion to dismiss. The State contends that Vining's pretrial motions tolled the time limits under the IAD.
Although we do not agree with the State that the time limits were tolled in this case, we find that the trial court properly denied Vining's motion to dismiss. "[I]n computing whether or not the requirements of [subsection (4)(c)] have been satisfied, it is appropriate to exclude all those periods of delay occasioned by the defendant." United States v. Scheer, 729 F.2d 164, 168 (2d Cir.1984). In this case, the original trial date of January 22, 1990, was set at Vining's arraignment on September 7, 1989. Even though Vining filed a number of motions, the original trial date was never changed. Thus, no delay can be attributed to Vining's motion practice.
However, "the time period formally set forth in a statute or rule does not establish absolute per se prejudice but [rather] ... is `a triggering mechanism' which establishes that the delay is presumptively prejudicial." R.J.A. v. Foster, 603 So.2d 1167, 1171 (Fla. 1992). In R.J.A., this Court determined that a statute which granted juveniles a right to be tried within ninety days did not overrule the juvenile speedy trial rule that allows the state an additional ten-day window to try cases that do not come within the ninety-day period.
Like the statutory provision at issue in R.J.A., the IAD grants prisoners subject to a detainer the right to trial within 120 days of arrival in Florida. This Court has previously stated that we will not grant greater dignity to the IAD's speedy trial time limit than to Florida's speedy trial rule which protects the constitutional right to a speedy trial enunciated in article I, section 16 of the Florida Constitution. Johnson v. State, 442 So.2d 193, 196 (Fla. 1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984). Thus, in order to determine whether the trial court erred in denying Vining's motion to dismiss we must determine whether the procedures of Florida Rule of Criminal Procedure 3.191 (1984) were followed in this case.
Rule 3.191(i)(3) provides that a defendant charged with a felony may, at any time after the expiration of the speedy trial time, file a motion for discharge. The motion for discharge can only be granted after certain procedures have been followed. No later than five days after the motion for discharge is filed, the court must hold a hearing on the motion. Fla.R.Crim.P. 3.191(i)(4). Unless the court determines that one of the reasons set forth in section (d)(3)[7] exists, the court shall order that the defendant be brought to trial within ten days. Id. If the defendant is not brought to trial within this ten-day period through no fault of the defendant, then the defendant "shall be forever discharged from the crime." Id.
In the instant case, Vining filed a motion for discharge on Wednesday, January 10, 1990, based upon violation of the time limits specified in the IAD. On Tuesday, January 16, the court conducted a hearing on Vining's motion to discharge, and denied that motion. Trial commenced on Tuesday, January 22, 1990.
The procedure followed in this case comports with that specified in rule 3.191(i)(4). The court was required to conduct a hearing no later than five days from the filing of Vining's motion for discharge. Florida Rule of Criminal Procedure 3.040, which specifies the method of computing any time period specified by these rules, provides in pertinent part:
[T]he day of the act or event from which the designated period of time begins to run is not to be included. The last day of the period so computed shall be counted, unless it is Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday nor a legal holiday. When the period of time prescribed or allowed shall be less than 7 days, intermediate Saturdays, Sundays and legal holidays *926 shall be excluded in the computation... .
Because the five-day time period prescribed for the motion hearing in rule 3.191(i)(4) is less than the seven days provided by the time computation rule, the intermediate Saturday and Sunday must be excluded from the computation in this case. Thus, the January 16 hearing was held four days after Vining's motion for discharge was filed. Furthermore, Vining was brought to trial six days after the motion hearing, which is within the ten-day limit specified by rule 3.191(i)(4). Thus, the trial court properly denied Vining's motion for discharge in this case.
Vining next claims that the trial court erred in allowing the State to present hypnotically-refreshed testimony, based upon this Court's decision in Bundy v. State, 471 So.2d 9 (Fla. 1985) (holding that hypnotically-refreshed testimony is per se inadmissible in a criminal trial), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986). Vining's counsel filed a motion in limine to suppress photographic identifications and in-court identifications of Vining, based upon the contention that the identifying witnesses had participated in hypnotic sessions conducted by the police. During hearing on this motion, a police officer who is a forensic hypnotist testified that witnesses Ward, Zaffis, and Donner had not been hypnotized, but had only been asked to relax and recall details from the day that Caruso disappeared.[8] The officer further testified that he asked only open-ended questions and suggested no details to the three witnesses. Both Ward and Zaffis testified that they had not been hypnotized and were fully conscious and aware of their surroundings throughout the interview. Both witnesses also testified that the relax and recall session did not produce any information that differed from their statements to the Winter Park Police Department and the Orange County Sheriff's Department prior to the session. Based upon this testimony, the judge ruled that the witnesses had not been hypnotized and denied Vining's motion to suppress the witnesses' identifications. The record in this case supports the judge's conclusion. See Stokes v. State, 548 So.2d 188, 190 (Fla. 1989) (defining hypnosis as "an altered state of awareness or perception" and finding that during hypnosis subject is placed in an artificially induced state of sleep or trance). Thus, we find no merit to this issue.
Vining also asserts that the trial court unfairly restricted the defense counsel's questioning of prospective jurors during voir dire and improperly denied challenges for cause. In responding to a written questionnaire prior to voir dire, ten prospective jurors indicated that the death penalty should always be imposed upon conviction for first-degree murder. Vining argues that the court unduly restricted defense counsel's questioning of these prospective jurors' views on mitigation and mercy in light of their responses to this question.
The scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused. Zamora v. State, 361 So.2d 776, 780 (Fla. 3d DCA 1978), cert. denied, 372 So.2d 472 (Fla. 1979). Based upon our review of the record in this case, we do not find that the judge abused his discretion in limiting the scope of questioning during voir dire. Although the judge did not permit questioning about the prospective jurors' personal views of what constitutes a mitigating circumstance, defense counsel was able to explore the potential jurors' understanding of the two-part procedure involved and their ability to follow the law as instructed by the judge in the penalty phase. In fact, the questioning was comprehensive enough to permit defense counsel to strike several prospective jurors for cause.
Vining also asserts that the trial court erred in refusing to grant challenges for cause of four prospective jurors, based upon doubts as to their ability to recommend a life sentence. The judge denied the challenges in each case.
*927 "The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely on the evidence presented and the instructions on the law given ... by the court." Lusk v. State, 446 So.2d 1038, 1041 (Fla.), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). Determining a prospective juror's competency to serve is within a trial court's discretion. Pentecost v. State, 545 So.2d 861 (Fla. 1989); Davis v. State, 461 So.2d 67 (Fla. 1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). Our review of the record shows that the jurors Vining complains about met the Lusk standard and that the trial judge did not abuse his discretion. We therefore find no error on this issue.

PENALTY PHASE
Vining raises six issues relating to the penalty phase of the trial: 1) the trial court improperly sentenced him based on information not presented in open court; 2) improper prosecutorial argument during the penalty phase rendered the jury's death recommendation unreliable; 3) the trial court erred in rejecting proferred nonstatutory mitigating factors; 4) the State failed to provide notice prior to trial and the penalty phase of the aggravating factors being relied upon to seek and to impose the death penalty; 5) Florida's death penalty statute is unconstitutional on its face and as applied; and 6) the evidence was legally insufficient to support the aggravating circumstance of cold, calculated, and premeditated.
Issues 4 and 5 are without merit and warrant little discussion. The aggravating factors to be considered in determining the propriety of a death sentence are limited to those set out in section 921.141(5), Florida Statutes (1987). Therefore, there is no reason to require the State to notify defendants of the aggravating factors that it intends to prove. Hitchcock v. State, 413 So.2d 741, 746 (Fla.), cert. denied, 459 U.S. 960, 103 S.Ct. 274, 74 L.Ed.2d 213 (1982). Vining's claim that Florida's death penalty statute is unconstitutional is also without merit and has been consistently rejected by this Court. See Thompson v. State, 619 So.2d 261, 267 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993), and cases cited therein.
Vining complains that the trial judge improperly considered matters not presented in open court, including depositions in the court file, the medical examiner's report, and the probate record of Caruso's estate. We find that this issue was waived for purposes of appellate review as defense counsel never objected to the court's consideration of this material. The record contains two letters from the trial judge that clearly inform counsel that the judge had reviewed these materials. The first letter was filed in open court on March 1, 1990, during a motion hearing prior to the penalty phase trial that commenced on March 7, 1990. The second letter was mailed to counsel on March 14, 1990, over three weeks before sentencing by the judge on April 9, 1990. Yet, defense counsel never raised any objection to the judge's review of these materials during the motion hearing, the penalty trial, or the sentencing proceeding. In fact, the record of the motion hearing reveals several instances where the judge discusses his review of depositions without comment or objection by defense counsel. Thus, contrary to Vining's assertion on appeal, the judge's consideration of this material was not revealed for the first time in the sentencing order.
Next, Vining contends that improper prosecutorial argument during the penalty phase rendered the jury's death recommendation unreliable. Specifically, Vining states that the prosecutor argued nonstatutory aggravating factors to the jury, shifted the burden of proof to the defendant, and denigrated the jury's role during the penalty phase. After reviewing the record in this case, we find no merit to this issue. Much of the prosecutor's argument that Vining labels as impermissible consisted of explaining the nature of the statutory aggravating factors and the weight that the jury should accord each of them. Other comments did not taint the jury's recommendation of death. See Crump v. State, 622 So.2d 963, 971-72 (Fla. 1993).
Vining also argues that the trial court erred in rejecting a number of proffered *928 nonstatutory mitigating factors. When evaluating mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. Campbell v. State, 571 So.2d 415, 419 (Fla. 1990); Rogers v. State, 511 So.2d 526, 534 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). In the instant case, the sentencing order includes a specific evaluation of nine nonstatutory mitigating factors proposed by Vining. Vining's good military history was the only factor that the trial court found to be a mitigating circumstance. However, the court concluded that it was entitled to little weight as it ended over thirty years ago, involved no sacrifice, and amounted to a government job from which Vining received a number of benefits. The record supports the court's conclusion that the other proposed factors either had not been established by the evidence presented or could not be considered of a mitigating nature. Hall v. State, 614 So.2d 473, 479 (Fla.), cert. denied, ___ U.S. ___, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993). Thus, we find no merit to this claim.
However, we find that the murder was not cold, calculated, and premeditated because the State has failed to prove beyond a reasonable doubt that Vining had a "careful plan or prearranged design" to kill Caruso. Rogers, 511 So.2d at 533. The sentencing order addresses this aggravating circumstance by concluding that the "only explanation of this murder is as a cold and calculated act, far beyond mere premeditation." However, as we explained in Rogers, "[w]hile there is ample evidence to support simple premeditation, we must conclude that there is insufficient evidence to support the heightened premeditation described in the statute, which must bear the indicia of `calculation.'" Id. Although there is evidence that Vining calculated to unlawfully obtain the diamonds from Caruso, there is insufficient evidence of heightened premeditation to kill Caruso. Thus, we find that the trial court erred in finding the cold, calculated, and premeditated aggravating circumstance.
Having rejected one of the aggravating circumstances, we must determine the effect of this error by examining the valid aggravating and mitigating circumstances. We find that the record supports the trial court's conclusions that the murder was committed during a robbery, was committed by a person under sentence of imprisonment, and that the defendant was previously convicted of a felony involving the use of violence to the person. Thus, we are left with the one mitigating circumstance of a good military history, which was afforded little weight, and three valid aggravating circumstances. Under the circumstances of this case, we conclude that the trial court would have imposed the same sentence even if it had not found the aggravating circumstance of cold, calculated, and premeditated. Consequently, we find the error harmless beyond a reasonable doubt. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Shere v. State, 579 So.2d 86 (Fla. 1991).
For the reasons stated above, we affirm the convictions and the sentence of death.
It is so ordered.
GRIMES, C.J., and OVERTON, McDONALD, SHAW, KOGAN and HARDING, JJ., concur.
NOTES
[1] § 941.45, Fla. Stat. (1987).
[2] § 921.141(5)(a), Fla. Stat. (1987).
[3] § 921.141(5)(b), Fla. Stat. (1987).
[4] § 921.141(5)(d), Fla. Stat. (1987).
[5] § 921.141(5)(i), Fla. Stat. (1987).
[6] Vining also claims that his motion for discharge was improperly denied because he was not brought to trial on the charges within 180 days after his request for final disposition under section 941.45(3), Florida Statutes (1987). This claim raises issues of whether Vining complied with the subsection (3) notice requirements of the IAD, and whether this jurisdiction follows a substantial compliance approach to the IAD. We need not reach these issues as the subsection (4)(c) time limit was triggered when Vining arrived in Florida pursuant to an acceptance of temporary custody "in connection with [Vining's] request for disposition of detainer."
[7] Florida Rule of Criminal Procedure 3.191(d)(3) (1984) lists four reasons why discharge would not be appropriate:

(i) a time extension has been ordered under (d)(2) and that extension has not expired, or
(ii) the failure to hold trial is attributable to the accused, a co-defendant in the same trial, or their counsel, or (iii) the accused was unavailable for trial under section (e), or (iv) the demand referred to in section (c) is invalid.
[8] The officer also testified that one other individual had been hypnotized. However, that individual did not testify at the trial.