841 So.2d 362 (2003)
Richard LYNCH, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-795.
Supreme Court of Florida.
January 9, 2003.
Rehearing Denied March 21, 2003.
*365 James B. Gibson, Public Defender, and Christopher S. Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charlie Crist, Attorney General, and Judy Taylor Rush and Douglas T. Squire, Assistant Attorneys General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the Circuit Court of the Eighteenth Judicial Circuit imposing the death penalty upon Richard Lynch. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm the judgment and sentence under review.

FACTS AND PROCEDURAL HISTORY
On March 23, 1999, a grand jury returned an indictment against appellant, Richard Lynch, for two counts of first-degree premeditated murder, one count of armed burglary of a dwelling, and one *366 count of kidnapping. The indictment was the result of events that occurred on March 5, 1999, culminating in the deaths of Roseanna Morgan ("Morgan") and her thirteen-year-old daughter, Leah Caday ("Caday").
On October 19, 2000, appellant pled guilty to all four counts of the indictment. Subsequently, the trial judge granted appellant's request to have the penalty phase conducted without a jury.[1] During the penalty phase, the State produced a letter written by the appellant two days prior to the murders. In the letter, addressed to appellant's wife, Lynch admitted to having a "long affair" with Roseanna Morgan, which lasted from August 1998 until February 9, 1999. He detailed the affair and asked his wife to send copies of cards Morgan had written to Lynch and nude pictures Lynch had taken of Morgan to Morgan's family in Hawaii. Lynch wrote: "I want them to have a sense of why it happened, some decent closure, a reason and understanding...."
The testimony elicited during the penalty phase regarding the events of March 5, 1999, included a tape of a telephone call that appellant made to the "911" emergency assistance service while still in the apartment where the murders occurred. On that tape, Lynch is heard admitting to the 911 operator that he shot two people at 534 Rosecliff Circle. He said he initially traveled to the apartment only to attempt to have Morgan pay a credit card debt, but resorted to shooting her in the leg and in the back of the head. He told the 911 operator that he had three handguns with him and that he shot Morgan in the back of the head to "put her out of her misery." Appellant also admitted to firing at the police when they first arrived on the scene.
As to Caday, appellant informed the 911 operator that he had held Caday at gunpoint while waiting for Morgan to return home. He related that she was terrified during the process prior to the shootings and asked him why he was doing this to her. Appellant admitted that he shot Caday, and said "the gun just went off into her back and she's slumped over. And she was still breathing for awhile and that's it." Appellant told the operator he planned to kill himself.
During the course of these events on March 5, 1999, appellant telephoned his wife three times from the apartment. His wife testified that during the first call she could hear a woman screaming in the background. Appellant's wife further testified that the screaming woman sounded "very, very upset." When Lynch called a second time, he admitted to having just shot someone.
Prior to being escorted from the apartment by police, Lynch also talked to a police negotiator. The negotiator testified that Lynch told her that during the thirty to forty minutes he held Caday hostage prior to the shootings, Caday was terrified, he displayed the handgun to her, she was aware of the weapon, and appeared to be frightened. He confided in the negotiator that Caday had complied with his requests only out of fear. Finally, appellant described the events leading to Morgan's death by admitting that he had confronted her at the door to the apartment, shot her in the leg, pulled her into the apartment, and then shot her again in the back of the head.
*367 Several of Morgan's neighbors in the apartment complex also testified as to the events of March 5, 1999. Morgan's neighbor across the hall[2] testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into Morgan's apartment. She further testified that Lynch knocked on the door to Morgan's apartment and said, "Hurry up, open the door, your mom is hurt." The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan's neighbor further testified that the door was opened, then after entering with Morgan, Lynch closed the door and approximately five minutes later she heard the sound of three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial gunshots, she heard three more.
After his arrest, appellant participated in an interview with police in which he confessed to the murders. He again admitted the events of the day, telling police he showed Caday the gun and that she was very scared while they were waiting for Morgan to arrive home. He told the detective that Caday was afraid and that he was "technically" holding her hostage. He admitted to shooting Caday's mother, Morgan, four or five times in the presence of her daughter.
In his post-arrest interview, Lynch also admitted that he planned to show Morgan the guns he brought with him to let her know he possessed them, and to force her to sit down and be quiet. He told the detectives he did not know why he did not just leave the guns in his car.[3] He admitted shooting Morgan four or five times, dragging her into the apartment, and then shooting her in the back of the head with a different firearm.
The State's final witness was the medical examiner who testified that after receiving the gunshot wound, it probably would have taken "no more than several minutes" for Caday to die. On cross-examination, although he conceded that it was possible that Caday could have died in less than one minute from the wound, such was unlikely. Finally, he also testified that with the amount of blood loss suffered by Caday, she could have lost consciousness within ten to twenty seconds.
The defense presented only one witness, a mental health expert. She related that she had diagnosed Lynch with schizoaffective disorder, a condition which is a combination of schizophrenia and a mood disorder. Further, she testified that she did not believe the letter appellant wrote two days prior to the murders demonstrated an intent by Lynch to kill Morgan. She concluded that appellant was under the influence of an extreme mental and emotional disturbance on March 5, 1999, and that his psychotic process substantially impaired his capacity to conform his conduct with the requirements of the law.
The State attempted to rebut the defense mental health evidence through the testimony of another mental health expert. The State's expert opined that Lynch suffered from a depressive disorder. The State's expert admitted that it was his opinion that on the day of the incident, appellant was suffering emotional distress, but it was not extreme, and Lynch did not lack the ability to conform his conduct to *368 the requirements of the law. Finally, the State's doctor opined that the letter appellant wrote prior to the murders evidenced a murder-suicide plot.
After accepting written closing arguments and sentencing recommendations and conducting a Spencer[4] hearing, the judge sentenced appellant to death for the murders of Roseanna Morgan and Leah Caday. He found three aggravating factors as to the murder of Morgan: (1) the murder was cold, calculated, and premeditated ("CCP") (given "great weight"); (2) appellant had previously been convicted of a violent felony (given "moderate weight"); and (3) the murder was committed while appellant was engaged in committing one or more other felonies (given "little weight"). As to the murder of Caday, the judge found (1) that the murder was heinous, atrocious, or cruel ("HAC") (given "great weight"); (2) that appellant was previously convicted of a violent felony (given "great weight"); and (3) that the murder was committed while appellant was engaged in committing one or more other felonies (given "moderate weight"). He also found one statutory and eight nonstatutory mitigators as to each murder.[5]
On appeal, Lynch argues that the trial court erred in finding the aggravating factor of HAC as to the murder of Caday and the aggravating factor of CCP as to the murder of Morgan. He also asserts that the trial court's sentencing order is unclear as to the findings of the mental health mitigators, and therefore this Court must either construe them as statutory mitigators or remand to the trial court for clarification. Finally, he contends that his death sentence is disproportionate and Florida's death penalty is unconstitutional on its face and as applied.

ANALYSIS
The law is well settled as to this Court's review of a trial court's finding of an aggravating factor:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Way v. State, 760 So.2d 903, 918 (Fla.2000) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). Here, Judge Eaton found the State had proven the HAC aggravating factor beyond a reasonable doubt as to the thirteen-year-old victim, Leah Caday, and applied great weight to that factor. In his sentencing order, the trial judge found the following facts supported his ruling:

*369 Leah Caday was confined in the apartment with the defendant for between thirty and forty minutes before her mother came home. During that time she was terrified of the defendant and his gun. After her mother came home she watched in horror while her mother was brutally murdered. Virginia Lynch heard her screaming in the background during the first phone call the defendant made to her. She had time to contemplate her impending death. See Hannon v. State, 638 So.2d 39 (Fla. 1994).
Further, the trial judge supported his ruling with the following legal analysis:
Fear and emotional strain may be considered as contributing to the heinous nature of the murder, even when the victim's death is almost instantaneous. Preston v. State, 607 So.2d 404 (Fla. 1992). The heinous, atrocious, or cruel aggravating circumstance may be proven in part by evidence of the infliction of "mental anguish" which the victim suffered prior to the fatal shot. Henyard v. State, 689 So.2d 239 (Fla.1997).
It is clear the trial judge used the correct rule of law in finding the HAC aggravating factor; therefore, the only remaining question for this Court is whether there is competent, substantial evidence to support his finding. The testimony elicited during the penalty phase provides competent, substantial evidence to support the finding of the HAC aggravating factor.
This Court has consistently held that "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." James v. State, 695 So.2d 1229, 1235 (Fla.1997); see also Francis v. State, 808 So.2d 110, 135 (Fla.2001); Farina v. State, 801 So.2d 44, 53 (Fla.2001). Moreover, this Court has held "the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death." Brown v. State, 721 So.2d 274, 277 (Fla. 1998); see also Card v. State, 803 So.2d 613, 625 (Fla.2001).
In determining whether the HAC factor was present, the focus should be upon the victim's perceptions of the circumstances as opposed to those of the perpetrator. See Farina, 801 So.2d at 53; see also Hitchcock v. State, 578 So.2d 685, 692 (Fla.1990). Further, "the victim's mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances." Swafford v. State, 533 So.2d 270, 277 (Fla.1988); see also Chavez v. State, 832 So.2d 730, 765-66 (Fla. 2002).
In Farina, the trial court found the victim suffered "real and excruciating" mental anguish and had an "acute awareness" of her impending death. 801 So.2d at 53. These facts, along with evidence showing the victim was held hostage and witnessed two coworkers being shot prior to her own death, supported the finding of HAC. See id. Similarly, this Court upheld the finding of HAC in Francis v. State, 808 So.2d 110 (Fla.2001), where elderly twin sisters were found dead in their home, both having been stabbed multiple times. To rebut the defendant's claim that HAC was not applicable because the deaths were instantaneous, the Court relied upon the medical examiner's testimony that both victims could have remained conscious for as little as a few seconds and for as long as a few minutes. See id. at 135. More significantly, the Court noted:
In this case, although the evidence did not establish which of the two victims was attacked first, the one who was first attacked undoubtedly experienced a tremendous amount of fear, not only for herself, but also for what would happen to her twin. In a similar manner, the *370 victim who was attacked second must have experienced extreme anguish at witnessing her sister being brutally stabbed and in contemplating and attempting to escape her inevitable fate. We arrive at this logical inference based on the evidence, including photographs presented at the guilt phase, which clearly establishes that these two women were murdered in their home only a few feet apart from each other.
Id. at 135.
Finally, in Hannon v. State, 638 So.2d 39 (Fla.1994), this Court upheld a finding of HAC where a man was shot after witnessing his roommate being brutally stabbed. There, the victim witnessed the roommate's death, pled for his own life, ran and hid, only to be found and shot six times. Hannon, 638 So.2d at 43. In Hannon this Court wrote: "Under these circumstances, where the victim undoubtedly suffered great fear and terror prior to being murdered, the trial court did not err in finding [the victim's] murder to be heinous, atrocious, or cruel." Id.
An examination of the evidence, along with the natural and proper common-sense inferences, establishes that Caday suffered enormous fear, emotional strain, and terror immediately prior to her death. The appellant admitted terrorizing this thirteen-year-old child by holding her hostage at gunpoint prior to shooting her mother and then turning the weapon on her. The appellant himself admitted to the 911 operator, whom he called following the shootings, and to the police in his post-arrest interview, that he held Caday at gunpoint in her home for thirty to forty minutes waiting for Morgan to arrive.[6] Lynch told the 911 operator that "the daughter was just terrified. She says why are you doing this to me." When he spoke to the police negotiator prior to his arrest, Lynch used the term "petrified" to define Caday's emotion at the time of the incident. In his post-arrest interview, Lynch admitted having his firearm in his hand when he told Caday to sit down inside the apartment. Lynch himself said, "She was afraid." When asked whether he was holding Caday hostage, Lynch replied, "I guess technically in a way of speaking...." The appellant's wife confirmed that when the appellant called her during the time he was holding Caday hostage "[t]here was a lady in the background screaming." Appellant's wife further testified that the screaming woman sounded "very, very upset." Clearly, Caday was terrified during the thirty to forty minutes prior to her death when she was being held hostage by Lynch.
Also significant in this analysis are the events immediately preceding Caday's death after her mother arrived at the apartment. Lynch admitted to the police negotiator that after holding Caday hostage for thirty to forty minutes, Morgan arrived at the apartment, Lynch confronted her and shot her in the leg, then dragged her into the apartment. He admitted the same to the 911 operator: "She had a couple of body hits.... I dragged her back inside so I could talk to her." In his post-arrest interview Lynch admitted shooting Morgan several times in front of her daughter, Caday.
Although Lynch maintained that Caday was shot accidentally during the time Lynch fired the initial four to five shots at Morgan before dragging her into the apartment, testimony from other witnesses does not support this assertion. Morgan's *371 neighbor across the hall testified that she looked out of the peephole in her door after hearing the initial shots and saw Lynch dragging Morgan by the hands into the apartment. She further testified that Lynch knocked on the door to Morgan's apartment and said, "Hurry up, open the door, your mom is hurt." The neighbor testified that Morgan was screaming and was bloody from her waist down. Morgan's neighbor further observed the door being opened, Lynch entering and closing the door behind him, and approximately five minutes later hearing three more gunshots. A second neighbor in the apartment complex also testified that approximately five to seven minutes after she heard the initial shots, she heard three more gunshots.
These facts are unlike those of Rimmer v. State, 825 So.2d 304 (Fla.2002), in which this Court explained that the victims, who had been held hostage for a short time during a robbery and were then killed, had not experienced the type of fear, pain and prolonged suffering necessary to support a finding of HAC. In that case, the facts were insufficient to support that the victims knew they would be killed or were in fear of their impending deaths. See id. at 327-29. Here, the evidence unquestionably supports the conclusion that the thirteen-year-old Caday feared for her own life while being held at gunpoint for thirty to forty minutes, and after witnessing her own mother being shot numerous times, surely experienced terror at the thought of her own impending death.
Lynch was totally indifferent to the suffering he caused Caday. The child undoubtedly witnessed her mother being shot several times. At any time during the thirty to forty minutes he held her hostage at gunpoint, Lynch could have released the child. He had complete disregard for her terror and suffering, and only heightened it by shooting her mother numerous times in her presence. The totality of the circumstances proves Caday suffered extreme fear and emotional strain just prior to her death, and also must have feared for her own life. Under these facts alone, the trial court properly found HAC.
Based upon the evidence, and giving due deference to Judge Eaton's ruling, appellant's argument that the trial court erred in finding the aggravating factor of HAC is meritless. The trial court judge applied the correct rule of law and his findings are supported by competent, substantial evidence. The evidence, along with the natural and proper common-sense inferences, establishes that Caday suffered fear, emotional strain, and terror during the events leading up to her murder, and thus HAC was appropriately found. There was utter indifference and total disregard for the suffering inflicted under these circumstances.
The trial court also properly applied the aggravating factor of CCP to the appellant's murder of Roseanna Morgan. This Court has established a four-part test to determine whether the CCP aggravating factor is justified: (1) the killing must have been the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and (2) the defendant must have had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification. Evans v. State, 800 So.2d 182, 192 (Fla. 2001) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)).
Further, this Court has held that "[a] defendant can be emotionally and mentally disturbed or suffer from a mental illness but still have the ability to experience cool *372 and calm reflection, make a careful plan or prearranged design to commit murder, and exhibit heightened premeditation." Evans, 800 So.2d at 193. Finally, this Court has noted that "[t]he facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course." Looney v. State, 803 So.2d 656, 678 (Fla.2001) (quoting Rodriguez v. State, 753 So.2d 29, 48 (Fla.2000)).
Initially, we hold it was not improper for the trial judge to rely upon the appellant's letter to his wife, written two days prior to the murders, as evidence supporting CCP. This Court has held that "circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor." Geralds v. State, 601 So.2d 1157, 1163 (Fla. 1992). In Geralds, the Court struck a finding of CCP because the circumstantial evidence in that case was "susceptible to... divergent interpretations." Id. at 1164. Unlike the circumstances in Geralds, the totality of the evidence here unquestionably supports CCP. The letter was not the only piece of evidence that supports CCP. The factors that support a finding of CCP here demonstrate that Lynch waited two days between writing the incriminating letter and executing his plan, had knowledge of and experience with handguns, took three such weapons with him as he proceeded to Morgan's apartment, and held Morgan's daughter hostage for thirty to forty minutes before Morgan arrived home. Therefore, in conjunction with all of the other evidence, it was not error to rely upon the letter to support the finding of CCP.
This Court has held that execution-style killing is by its very nature a "cold" crime. See Walls v. State, 641 So.2d 381, 388 (Fla.1994). In Looney, this Court noted the significance of the fact that the victims were bound and gagged for two hours, and thus could not offer any resistance or provocation. 803 So.2d at 678. Further, the defendants in that case had "ample opportunity to calmly reflect upon their actions, following which they mutually decided to shoot the victims execution-style in the backs of their heads." Id.
Similarly, Lynch's killing of Morgan evinces the element of "cold" necessary for a finding of CCP. Lynch himself admitted to the 911 operator, the police negotiator, and the police in his post-arrest interview that he shot Morgan in the back of the head, killing her. Having already been shot at least four times prior to a final shot to the head, and knowing that her daughter was still in the apartment, Morgan did not offer any resistance or provocation. Further, witnesses reported a five- to seven-minute delay between the initial shots and the final three after Morgan had been wounded in the initial confrontation. During this time, Lynch had the opportunity to withdraw or seek help for Morgan by calling 911; instead he calculated to shoot her again, execution-style. Despite Lynch's subsequent attempted self-serving rationalization that he only wanted to put her out of her misery, the appellant's execution-style murder of Morgan clearly satisfies the "cold" element of CCP.
As to the "calculated" element of CCP, this Court has held that where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of "calculated" is supported. See Hertz v. State, 803 So.2d 629, 650 (Fla.2001); see also Knight v. State, 746 So.2d 423, 436 (Fla. 1998). Here, Lynch possessed three handguns as he traveled to Morgan's apartment where, after shooting her at least four times near the entrance, he then waited approximately five to seven minutes before *373 shooting her again in the back of the head, execution-style. Lynch clearly had time to reflect upon these events before firing the final shots; in fact he purposely used a different weapon to shoot her in the head than he had used to inflict the initial wounds. See Ford v. State, 802 So.2d 1121, 1133 (Fla.2001) (finding CCP where defendant used three different weapons and had to stop and reload prior to shooting each victim execution-style). Clearly, in this case a finding of the "calculated" element was proper.
The third element, "heightened premeditation," is also supported by competent and substantial evidence. This Court has "previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder." Alston v. State, 723 So.2d 148, 162 (Fla.1998); see also Jackson v. State, 704 So.2d 500, 505 (Fla.1997). In Alston, this Court upheld a trial court's finding of CCP where the defendant had ample time to reflect upon his actions and was not under the influence of alcohol, drugs, or the domination or pressure of another person. Alston, 723 So.2d at 161; see also Dennis v. State, 817 So.2d 741, 765 (Fla.2002) (upholding CCP where facts showed defendant arrived at apartment before victim and waited for her arrival), cert. denied, ___ U.S.___, 123 S.Ct. 604, 154 L.Ed.2d 527 (2002). Similarly, Lynch had the opportunity to leave the crime scene and not kill Roseanna Morgan. As in Dennis, Lynch arrived at Morgan's apartment and waited for thirty to forty minutes for her to arrive. During this time, regardless of what his intentions may have been prior to Morgan's arrival, Lynch had ample opportunity to leave the scene. Further, after initially shooting Morgan and then dragging her into the apartment, Lynch had five to seven minutes in which he could have left the scene and not inflicted the final harm. Despite this time to reflect, Lynch chose to shoot Morgan in the head, execution-style, killing her. The evidence of Lynch's actions competently and substantially supports "heightened premeditation."
The final element of CCP is a lack of legal or moral justification. "A pretense of legal or moral justification is `any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.'" Nelson v. State, 748 So.2d 237, 245 (Fla.1999) (quoting Walls, 641 So.2d at 388). This Court has refused to find a moral or legal justification where the defendant offered evidence that he killed three people to prevent them from performing legal abortions, see Hill v. State, 688 So.2d 901, 907 (Fla.1997), and where the defendant offered the justification of wanting to spare his family from having to go through a divorce. See Zakrzewski v. State, 717 So.2d 488 (Fla.1998). Defendant's attempted justifications for the murder based on Morgan's alleged rejection of him as a lover and her refusal to fully pay a credit card debt are completely without merit or support, and are therefore rejected.
Further, appellant's reliance upon Almeida v. State, 748 So.2d 922 (Fla.1999), is misplaced. In Almeida, the defendant had been consuming alcohol prior to committing the crime, and the trial court found the defendant was "extremely disturbed at the time of the crime" and his ability to "appreciate the criminality of his conduct was substantially impaired." Almeida, 748 So.2d at 933. Appellant argues that his compromised mental health state caused him to believe he was without any other *374 recourse and it rendered him without impulse control. However, the sentencing judge concluded that "defendant was sufficiently in control of his faculties to plan and carry out the murder of Roseanna Morgan." This determination is supported by the evidence. Lynch lay in wait, shot Morgan at least four times, then had the presence of mind to change firearms prior to inflicting the fatal shot. There is no evidence that Lynch was intoxicated. Clearly, this case differs significantly from Almeida.
Finally, defendant's claim that Florida's death penalty scheme is unconstitutional because the CCP aggravating factor is applied in an arbitrary and capricious manner is without merit. This Court has upheld the CCP aggravating factor as constitutional. See Fotopoulos v. State, 608 So.2d 784, 794 (Fla.1992). Therefore, because the trial judge properly found the CCP aggravating factor, and his determination is supported by competent, substantial and unrebutted evidence, appellant's second claim cannot be sustained.
With respect to the third issue, appellant argues that in his written sentencing order, Judge Eaton was unclear as to whether he found the mental health mitigators to be statutory or nonstatutory mitigators. In the body of his order, Judge Eaton wrote:
The crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance.
The experts called by the defense and the state presented evidence on this mitigating circumstance. They did not agree with each other. Dr. Olander believed the defendant was under the influence of extreme mental or emotional disturbance. Dr. Riebsame believed the disturbance to be less than extreme. Dr. Riebsame's testimony is the most credible. The defendant was emotionally disturbed. His girlfriend had decided to return to her husband and this meant loss of a sex partner for whom he had strong feelings. However, he was able to plan his course of action and carry out all but the suicide portion of the plan. The court gives the emotional disturbance suffered by the defendant moderate weight.
The defendant's capacity to conform his conduct to the requirements of law was substantially impaired.
The experts, Dr. Olander and Dr. Riebsame, agreed that the defendant's capacity to conform his conduct to the requirements of law was impaired. They disagree on the degree of impairment. Dr. Olander believes the defendant has a schizoaffective disorder. Dr. Riebsame did not believe the defendant has a schizoaffective disorder. He noted that the defendant did not suffer delusions or have difficulty recalling events about the murders. He testified that it is usual for a person with such a disorder to report a very bizarre description of events that makes sense to him or her but not to anyone else. Dr. Riebsame's testimony on this issue is the most credible and is accepted by the court. The fact that the defendant's capacity to conform his conduct to the requirements of law was impaired, but not substantially impaired, is given moderate weight.
However, in the summary at the end of his sentencing order, Judge Eaton wrote:

The crime for which the defendant is to be sentenced was committed while he was under the influence of extreme mental or emotional disturbance. Moderate weight.

The defendant's capacity to conform his conduct to the requirements of law was substantially impaired.Moderate weight. *375 Appellant argues that because Judge Eaton used the words "extreme" and "substantially" in his summary, but not in the body of his order, it is unclear whether he found these mental health mitigators to be statutory or nonstatutory. Therefore, Lynch reasons that because of the confusion, this Court should either deem the lower court to have found the mitigators to be statutory, or in the alternative, remand back to the lower court for clarification.
Initially, the State is incorrect in its argument that appellant is procedurally barred from presenting this issue here. Presumably,[7] the State's argument is based upon Florida Rule of Criminal Procedure 3.800(b), which holds that the defendant must file, in the lower court, a motion to correct a sentencing error, or the defendant will be procedurally barred from raising the issue on appeal. See Fla. R.Crim. P. 3.800. However, the rule itself expressly states "[t]his subdivision shall not be applicable to those cases in which the death sentence has been imposed and direct appeal jurisdiction is in the Supreme Court under [article I, section 3(b)(1) of the Florida Constitution]." Id. Therefore, because the rule itself is clear that appellant was not required to assert this issue in the lower court, he may properly present it here.
Arguably, the trial judge's sentencing order may not be as clear as perhaps it could have been. While there may be a minor discrepancy in his written order between the body of his order and the summary, it is clear from reading the totality of the order that Judge Eaton weighed the testimony of the mental health experts and found the State's expert to be the more persuasive. This is a question of form, not substance. Judge Eaton evaluated the two mental health mitigators and clearly found them to be nonstatutory and then afforded the weight he found appropriate under the evidence presented on mental health. Therefore, appellant's third claim is no basis for reversal.
In his fourth claim, appellant challenges the proportionality of his death sentence. Prior to determining the appropriateness of his sentence, this Court must
examine the sufficiency of the evidence underlying the conviction. Here, the appellant pled guilty to two counts of first-degree premeditated murder, one count of armed burglary of a dwelling, and one count of kidnapping. When a defendant has pled guilty to the charges resulting in a penalty of death, this Court's review shifts to the knowing, intelligent, and voluntary nature of that plea. See Ocha v. State, 826 So.2d 956 (Fla.2002). "Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." Id. at 965. The record in this case contains substantial evidence which shows that the underlying guilty plea was knowing, intelligent, and voluntarily made. The trial judge conducted the following colloquy with the defendant:

*376 The Court: ... Mr. Lynch, is that what you want to do, enter a plea of guilty to those charges?
Mr. Lynch: Yes, Your Honor.
The Court: Have you read everything on this plea form?
Mr. Lynch: Yes, I have.
The Court: Do you understand everything on the plea form?
Mr. Lynch: Yes.
The Court: Do you have any questions about anything on the plea form?
Mr. Lynch: No. I've talked it over with my counsel.
The Court: Is everything on the plea form true?
Mr. Lynch: Yes.
. . . .
The Court: You can read, write, speak and understand the English language?
Mr. Lynch: Yes.
The Court: Are you in good physical and mental health?
Mr. Lynch: Yes, as far as I know.
The Court: Have you had any drugs or alcohol in the last twenty-four hours?
Mr. Lynch: No, other than what the jail has prescribed for me, just some antidepression sleeping pill.
The Court: Okay. Do you feel that your mind is clear and you know exactly what you're doing this morning?
Mr Lynch: Yes, Your Honor.
The Court: Do you believe you're capable of exercising your best judgment today?
Mr. Lynch: Yes.
. . . .
The Court: Do you understand that the maximum penalty you could receive in this case would be either life in prison without parole, or the death penalty; do you understand that?
Mr. Lynch: Yes, I do.
The Court: Do you understand that a plea of not guilty denies the truth of the charge, and a plea of guilty admits the truth of the charge?
Mr. Lynch: Yes.
The Court: You have the right to have a trial by jury to see, hear, face and cross-examine the witnesses against you in open court, and the subpoena power of the Court to call witnesses in your behalf. You have the right to testify at trial, or remain silent, and your silence cannot be held against you. You have to the right to be represented by lawyers at the trial. But if you enter a plea of guilty, you'll waive that right and give up those rights and there will be no trial; do you understand that?
Mr. Lynch: Yes, Your Honor.
The Court: Do you want to give up those rights?
Mr. Lynch: Yes.
. . . .
The Court: Has any person threatened you or coerced you into entering this plea?
Mr. Lynch: No.
. . . .
The Court: Has any person promised any leniency or any reward to get you to enter this plea, other that's what has been said here in open court here today?
Mr. Lynch: No.
The Court: Has there been any off the record assurances made to you by your lawyers or by anyone else?
Mr. Lynch: No.
The Court: Are you sure about your answers that you've given me this morning?
Mr. Lynch: Yes, Your Honor.
Further, after the judge read the charges to the defendant, the colloquy continued:

*377 The Court: Do you understand those are the charges?
Mr. Lynch: Yes, Your Honor.
The Court: Are you guilty of those charges?
Mr. Lynch: Yes.
Clearly the appellant understood the charges and pled to them voluntarily. The evidence here is sufficient to support that the guilty plea underlying the convictions was given knowingly, intelligently, and voluntarily.
Having determined the sufficiency of the evidence supporting Lynch's conviction, we next examine the appellant's sentence of death. It is well settled that the purpose of this Court's proportionality review is to "foster uniformity in death-penalty law." Id. (quoting Tillman v. State, 591 So.2d 167, 169 (Fla.1992)). Further, the number of aggravating factors cannot simply be compared to the number of mitigating factors, rather there must be "a thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Id. (quoting Beasley v. State, 774 So.2d 649, 673 (Fla. 2000)). When compared to other decisions of this Court, the death sentences for the murders in this case are proportionate.
Here, the trial court properly found three aggravating factors applicable to each murder. This Court has held that both HAC and CCP are "two of the most serious aggravators set out in the statutory scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). Further, the trial court found one statutory mitigator,[8] and eight nonstatutory mitigators.[9] Appellant asks this Court to reweigh the evidence and give each aggravating factor less weight, and afford each mitigating factor greater weight. However, Judge Eaton properly outlined the support for all of his factual findings, and the evidence supports his conclusions. Each aggravating factor is supported by competent, substantial evidence, and there is nothing to suggest he abused his discretion in determining the weight that should be given to each aggravating and mitigating factor. See Sexton v. State, 775 So.2d 923, 934 (Fla.2000) (holding abuse of discretion standard applicable in determining if trial court afforded proper weight to aggravating factor); Cole v. State, 701 So.2d 845, 852 (Fla.1997) (holding trial court's decision as to weight given to mitigating factors is subject to abuse of discretion standard).
This Court does not recognize a domestic dispute exception in connection with death penalty analysis. The State correctly asserts that Lynch had no domestic dispute with Caday, and therefore any such exception could not be even remotely considered or applicable to her murder. Further, there is competent and substantial evidence within the record which supports the finding of the CCP aggravator as to Morgan's murder. It is impossible to reconcile application of the CCP aggravator with a domestic dispute exception, and therefore it is likewise impossible *378 to apply any such domestic dispute exception to Morgan's murder.
As we compare other cases decided by this Court, the death penalty is clearly applicable to both murders here. See Smithers v. State, 826 So.2d 916, 931 (Fla. 2002) (upholding death sentence in double homicide where two aggravators, previous felony and HAC, two statutory mitigators, and seven nonstatutory mitigators were applicable to second victim); Morton v. State, 789 So.2d 324, 328-29 (Fla.2001) (upholding death sentence in double homicide where three aggravators, CCP, avoiding arrest, and committed while engaged in a felony, two statutory and five nonstatutory mitigating factors were applicable to one victim); Robinson v. State, 761 So.2d 269, 272-73 (Fla.1999) (upholding death sentence where trial court found three aggravating factors, pecuniary gain, avoiding arrest, and CCP, two statutory mitigating factors, and eighteen nonstatutory mitigating factors).
Lynch inflicted two deaths in the home of the victims, and had the opportunity to carefully reflect and consider his actions before both killings. This is not a case of a domestic dispute gone badthis is a case of a murder-suicide plot that was only partially completed. Lynch had knowledge of and experience with firearmsthis cannot be considered an accidental shooting. The trial court properly sentenced Richard Lynch to death for the murders of a thirteen-year-old girl and her mother.
Finally, appellant challenges the constitutionality of Florida's death penalty scheme. Because this Court has consistently upheld Florida's death penalty scheme, and has rejected all of appellant's claims, appellant is not entitled to relief on such issue. Appellant's first claimthat Florida's death penalty scheme is unconstitutional because it fails to provide notice as to aggravating circumstancesis rejected based on the ruling of Vining v. State, 637 So.2d 921 (Fla.1994). There this Court wrote: "The aggravating factors to be considered in determining the propriety of a death sentence are limited to those set out in section 921.141(5), Florida Statutes (1987). Therefore, there is no reason to require the State to notify defendants of the aggravating factors that it intends to prove." Vining, 637 So.2d at 928. Appellant's second and third claimsthe limitation of unrestricted consideration of mitigating evidence, and the fact that not all evidence is accepted as mitigatingare also rejected. In Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), this Court upheld and clarified Florida's death penalty sentencing scheme as to the consideration of mitigating factors as applied here.
Appellant's fourth, fifth, and sixth claimsthat the burden is shifted to the defendant to prove the mitigating circumstances, that the HAC aggravating factor is applied in a vague and inconsistent manner, and that the murder in the course of a felony aggravating factor creates an automatic aggravating factor in all felony murders, resulting in arbitrary application of this aggravating factor must be rejected based upon this Court's recent decision in Floyd v. State, 808 So.2d 175 (Fla.2002). In Floyd this Court denied the defendant's burden shifting argument, see id. at 186, his argument challenging the HAC aggravating factor as vague and overbroad, see id. at 187, and his murder in the course of a felony argument, see id. at 186.
Appellant's final two argumentsthat the statute allows excessive and disproportionate penalties to be imposed and that the death penalty is not the least restrictive means available to further the state's compelling goals where a fundamental right, human life, is involvedare also without merit. This Court has consistently *379 upheld Florida's death penalty scheme as constitutional.
Based upon the foregoing we find no reason to reverse the appellant's convictions and sentences. We therefore affirm the judgment and sentence of the circuit court below.
It is so ordered.
WELLS, LEWIS and QUINCE, JJ., and HARDING, Senior Justice, concur.
PARIENTE, J., concurs in result only with an opinion, in which ANSTEAD, C.J., and SHAW, Senior Justice, concur.
PARIENTE, J., concurring in result only.
Although I concur with the majority in upholding the HAC aggravator, I do not agree with the portion of the majority opinion that characterizes the relevant inquiry as focusing on the victim's perceptions. See majority op. at 369. While I agree that whether the victim suffered before his or her death is part of the HAC determination, this inquiry is only part of the equation. As I discussed in my concurring in result only opinion in Francis v. State, 808 So.2d 110, 142-144 (Fla.2002), cert. denied, ___ U.S.___, 123 S.Ct. 696, 154 L.Ed.2d 635 (2002), for the HAC aggravator to apply, the defendant must have "acted with a desire to inflict a high degree of pain" or with "utter indifference to or enjoyment of the suffering of another." Id. at 142 (Pariente, J., concurring in result only).
In upholding the HAC aggravator against constitutional attack based on claims of vagueness, we explained:
The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony.... It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital feloniesthe conscienceless or pitiless crime which is unnecessarily torturous to the victim.

State v. Dixon, 283 So.2d 1, 9 (Fla.1973) (emphasis supplied). Our emphasis in Dixon on "additional acts "supports the conclusion that the defendant's actions must be part of the evaluation of whether the crime under consideration is "especially heinous, atrocious or cruel."
Our explanation and definition of HAC from Dixon was then codified in the Florida Standard Jury Instructions, which provide:
The crime for which the defendant is to be sentenced was especially heinous, atrocious or cruel. "Heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageously wicked and vile. "Cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.
Fla. Std. Jury Instr. (Crim.) 7.11 Penalty ProceedingsCapital Cases.
As properly recognized by the majority, in this case Lynch did perform additional acts that demonstrate his utter indifference *380 to the suffering of the thirteen-year-old victim: he held her hostage at gunpoint for thirty to forty minutes; he was aware of her "petrified" state and did nothing to allay her fears of impending death; and he intentionally shot her mother several times in front of this minor victim before taking the victim's own life. See majority op. at 11-14. For these reasons, I concur in the affirmance of the finding of the HAC aggravator.
ANSTEAD, C.J., and SHAW, Senior Justice, concur.
NOTES
[1] Because appellant requested and was granted a penalty phase conducted without a jury, he has not and cannot present a claim attacking the constitutionality of Florida's death penalty scheme under the United States Supreme Court's recent holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Therefore, we do not address this issue.
[2] The neighbor lived in the apartment directly across the hall from Morgan's apartment in the same apartment building.
[3] The detective conducting the interview with appellant testified that Lynch's car was parked down the street, around the corner, and away from Morgan's apartment. It could not be seen from the apartment.
[4] Spencer v. State, 615 So.2d 688 (Fla. 1993).
[5] The statutory mitigating factor found was that Lynch had no significant history of prior criminal activity (moderate weight). The eight nonstatutory mitigators were: (1) the crime was committed while defendant was under the influence of a mental or emotional disturbance (moderate weight); (2) the defendant's capacity to conform his conduct to the requirements of law was impaired (moderate weight); (3) the defendant suffered from a mental illness at the time of the offense (little weight); (4) the defendant was emotionally and physically abused as a child (little weight); (5) the defendant had a history of alcohol abuse (little weight); (6) the defendant had adjusted well to incarceration (little weight); (7) the defendant cooperated with police (moderate weight); (8) the defendant's expression of remorse, the fact that he has been a good father to his children, and his intent to maintain his relationship with his children (little weight).
[6] This fact is also supported by the appellant's guilty plea to the charge of kidnapping Leah Caday.
[7] The State cites two cases for its proposition that appellant is procedurally barred from raising this issue, Steinhorst v. State, 412 So.2d 332 (Fla.1982), and Wise v. State, 767 So.2d 1162, 1163 (Fla.2000). Examination of these cases shows the State must be arguing Lynch is procedurally barred from raising this issue because it was not presented to the lower court and does not constitute a fundamental error that may be raised on direct appeal. In Wise, this Court relied upon the decision of Maddox v. State, 708 So.2d 617 (Fla. 5th DCA 1998) approved in part, disapproved in part, 760 So.2d 89 (Fla.2000). In Maddox, this Court examined the amendment to Florida Rule of Criminal Procedure 3.800(b).
[8] The defendant has no significant history of prior criminal activity. The trial court found this element proven, but in light of the fact that this was a double murder, afforded it only little weight.
[9] As to the remaining eight nonstatutory mitigators, the trial court afforded three "moderate" weight, and five "little" weight. It must be noted that in the body of his written sentencing order, Judge Eaton included a tenth mitigator"When possible, the defendant has sought gainful employment"and afforded it little weight. However, Judge Eaton did not include this mitigator in his oral pronouncement or in the summary of his written sentencing order, and therefore it is not considered here.