PER CURIAM.
 

 Andrew Richard Allred was convicted of two counts of first-degree murder for the 2007 deaths of Tiffany Barwick and Michael Ruschak. The trial court accepted Allred’s guilty plea and, after receiving evidence in the penalty phase, sentenced Allred to death for both murders. This is Allred’s direct appeal. We have jurisdietion.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. In accordance with our discussion below, we affirm the convictions and sentences.
 

 I. BACKGROUND
 

 A. Procedural Matters: Waivers and Guilty Plea
 

 Allred was indicted on October 23, 2007, on the following charges alleged to have occurred on September 24, 2007: (1) first-degree premeditated murder of Michael Ruschak by shooting with a firearm; (2) first-degree premeditated murder of Tiffany Barwick by shooting with a firearm; (3) armed burglary of a dwelling while inflicting great bodily harm or death; (4) aggravated battery with a firearm (victim Eric Roberts) while inflicting great bodily harm or death; and (5) criminal mischief of a motor vehicle (Barwick’s car). Then, on April 30, 2008, Allred entered written and oral guilty pleas to all charges. The trial court conducted a plea colloquy of the defendant and accepted the guilty plea, concluding as follows:
 

 The Court finds that you are an alert and an intelligent individual capable of exercising your best judgment, it’s your decision to enter a plea of guilty to these offenses, [the plea] has been made freely and voluntarily after [your] having received advice from your attorney with whom you’re satisfied, and a factual basis exist[s] for the pleas by your admission under oath. I’ll accept the pleas.
 

 The next month, against the advice of counsel, Allred moved to waive his right to a jury in the penalty phase and to waive his right to be present during the proceedings. After determining that All-red understood the consequences of these waivers, the Court overruled the State’s objection and granted Allred’s requests.
 

 At the conclusion of an August 2008 pretrial hearing, Allred unexpectedly
 
 *1272
 
 blurted out that he wanted to fire the public defender’s office. The trial judge informed Allred that he would soon hold a hearing on this new request. At the September 4, 2008, hearing, Allred’s counsel recited the facts that Allred had requested dismissal of counsel in August and subsequently had given counsel a written request for a hearing on the request to represent himself. Defense counsel explained that the parties still had witnesses to depose and evidence to prepare before the penalty phase could commence. The trial court explained to Allred that a complete record in the case was necessary for Supreme Court review. Thus, if the trial court found after a
 
 Faretta
 

 [1]
 

 hearing that Allred was capable of representing himself, the process would not speed up — it would actually slow down. Allred acknowledged his understanding of this explanation and withdrew his request to represent himself “[i]f [the proceedings] can be done soon.” The parties agreed that they would work expeditiously.
 

 B. Penalty Phase: The State’s Case
 

 The penalty phase was held September 22-24, 2008.
 
 [2]
 
 Because Allred pleaded guilty, the State presented evidence regarding the murders to establish a basis for aggravating factors, after which the defense presented mitigation testimony.
 

 On August 25, 2007, Allred celebrated his twenty-first birthday with a party at his family’s home in Oviedo. A number of people attended, including his best friend Michael Ruschak and Allred’s live-in girlfriend, Tiffany Barwick. Allred and Bar-wick had dated for about a year and lived together for the last several months. The relationship with Barwick, however, came to an abrupt and public end at the birthday party. When Barwick told Allred she “wanted her stuff back,” Allred went to the room they shared, gathered her belongings, and began throwing them over the property’s fence.
 
 [3]
 
 Someone called the police, who upon arrival ordered Allred to stop but did not arrest him.
 

 A few days later, Allred bought a Springfield XP .45 caliber handgun. Because of the legal waiting period, however, he did not take possession of it until September 7. On that day, he used pictures of Barwick for target practice and subsequently emailed Barwick a photo of the bullet-riddled pictures that were hanging on the wall of his room.
 

 Witness testimony and digital messaging indicated that in the days shortly before the murders, Allred discovered that — subsequent to the breakup — Ruschak and Barwick had sexual intercourse. Allred became angry and sent threatening messages to his “ex-best friend” and his ex-girlfriend. He also discussed his feelings with friend Michael Siler. In an instant message exchange with Siler on September 23, Allred stated, “I pretty much just need to start killing people.” The next day, September 24, 2007, the day of the murders, Allred specifically threatened the lives of Barwick and Ruschak. In an instant message chat with Siler in the morn
 
 *1273
 
 ing, Allred stated, “I’m pretty much gonna kill him ... Ruschak ... and her.” In an electronic conversation with victim Rusc-hak on that same day, Allred told him, “If [I] see you again, [I] will kill you, and yes that is a threat.” Finally, Allred and Bar-wick engaged in a heated and lengthy computer exchange on the day of the murder. Allred informed Barwiek that he had hacked into her computer, changed the passwords, deleted files, and sent emails to people on her contacts list. He also transferred all of the funds in her bank account to pay her credit card debt. Calling her a “whore” because of her relationship with Ruschak, Allred said he could not forgive her for that and threatened, “[I]f, I ever see [Ruschak] again I will kill him.”
 

 Allred was fired from his job instructing on the use of computer software on the day of the murders. That evening, he and Siler went to dinner at a local restaurant. They talked about work and other subjects, but Allred seemed not to care about anything and often shrugged in response to questions. Allred drove Siler home about an hour later. Siler testified that as Allred left, the thought that Allred might be suicidal crossed his mind.
 

 After dropping Siler off, Allred drove first to a grocery store and bought beer. Then he went home for a while, but he did not drink any of the beer. Later, knowing that Barwiek would be with Ruschak, All-red contacted Ruschak, stating that he was coming to Ruschak’s house. Allred then picked up the .45 he bought for his birthday and went out to his truck.
 

 At the time of the murders, Ruschak was living in the home of friend Eric Roberts at 100 Shady Oak Lane. A neighbor, Steve McCavour, testified that at approximately 10 p.m. on September 24, 2007, he saw a large black truck repeatedly crashing into a white car. He called 911 and observed the driver go to the front door of Roberts’ house, kick and bang on it, and then head around the house.
 

 Roberts and roommate Ruschak had invited friends over that night for dinner and to watch a popular television program. Tiffany Barwiek was living there temporarily, and the other guests present were Justin Kovacich, Philip Cammarata, Kathryn Cochran, and Charles Bateman. Soon after all the guests arrived, Ruschak told the group that he had just received a message from Allred stating that he was coming over. Ruschak suggested calling Allred’s mother to see if Allred had left home and someone suggested calling the police, but neither call was made. The message that Allred was coming over, however, put Barwiek “in full panic mode.”
 

 Soon thereafter, witnesses sitting in the living room heard a loud noise outside the house, which Cochran testified sounded “like a mortar going off.” Ruschak, who was in the kitchen at the front of the house, looked out the window and announced that Allred had arrived. Ruschak then quickly locked the front door just before Allred banged loudly on it, yelling, “[L]et me in.”
 

 When no one opened the door, Allred went to the back of the house, where the guests had assembled in the living room. He banged on the sliding glass door, and Barwiek ran up the hall to a bathroom near the front of the house. The glass door suddenly shattered when Allred fired a shot into it. He walked into the house, holding his gun. He recognized all of the people standing before him, but he said nothing. The people present began to scream and look for an escape route. Together, Cammarata and Kovacich ran up the hallway to the front door, unlocked it, and fled as they heard gunshots. Kova-cich then called 911.
 

 
 *1274
 
 Allred saw Ruschak peer around the corner from the kitchen, and Allred fired a shot up the hallway in his direction. All-red walked past Roberts, who had just come down the hallway from the front door, and went directly to the kitchen, where he shot Ruschak several times. At this point, Roberts grabbed Allred from behind and asked Allred what he was doing. Allred struggled with Roberts, telling him to let go. When Roberts did not release him, Allred pointed the gun downward and fired a shot that hit Roberts’ right leg. During this struggle, Bateman ran out the shattered back door and into the woods, where he called 911. Realizing he could escape the same way, Roberts let go of Allred and ran to a neighbor’s house. When his neighbors opened them door, Roberts asked them to call 911 and soon heard Allred drive off in his truck. Roberts realized he had been shot when his neighbors pointed to the blood on his pants.
 

 At this point, only Barwiek and Cochran remained alive in the house with Allred. Barwiek was in the hall bathroom at the front of the house, where she fled when Allred first entered. Standing in the bathtub, Barwiek called 911. At the beginning of the call, Barwiek tried to provide the 911 dispatcher with the necessary information. However, as the gunshots sounded in the background, she began to scream and hyperventilate. Finally, the line went dead. In his confession, Allred recounted that after he gained his release from Roberts, he entered the bathroom. Then, without saying a word, he fired multiple shots into Barwiek. She collapsed in the tub and died.
 

 While hidden in the master bathroom, Cochran heard the others yelling and running, and she heard the gunshots. Finally, she heard Barwick’s screaming, followed by more gunshots and then silence. Soon, Roberts returned to the house. He saw Ruschak lying face down in the front doorway and then found Cochran still hiding in the bathroom at the back of the house. Roberts told her that Aired was gone. The police arrived shortly thereafter.
 

 Mter leaving the crime scene, appellant called 911. He reported that he had killed two people and threatened to commit suicide. When Deputy Sheriff David Kohn arrived at Alred’s home, Aired was standing at the end of his driveway near the road, with a cell phone in his hand and his gun on the ground. Upon initial contact, Aired told the officer, “I’m the guy you’re looking for.” Ater the officer secured him, Aired asked “if the people were dead,” but the officer told him he could not provide that information. Then, in the patrol car, Aired stated, “I knew I killed someone, I shot fourteen times.”
 

 Aired was turned over to the Oviedo Police Department, and he was interviewed by two detectives after he was advised of his Miranda
 
 [4]
 
 rights. In his confession, Aired largely admitted the above factual description as to the actual murders. He admitted firing fourteen shots during the incident, emptying the clip, but he denied sending any threatening messages. He stated that he bought the .45 pistol only because he “could” after he turned twenty-one. Athough he usually left his gun at home unless he was going to target practice, he gave no reason for taking it with him that night. He acknowledged using Barwick’s picture for target practice earlier in the month,. but he claimed that he did not think of killing her until the night of the murders. He denied, however, that he went to the house that night with the intent to shoot Barwiek and Ruschak and stated that he went there
 
 *1275
 
 solely to ram her car. He explained that he killed Ruschak because his “ex-best friend” was “an asshole” who sided with Barwick in their breakup, but he gave no reason for the murder of Barwick. Allred did not speak to either victim before he shot them.
 
 [5]
 

 The medical examiner, Dr. Predrag Bulic, performed the autopsies on the victims. He testified that Ruschak had four gunshot wounds but there was no way to determine the order in which the shots were fired. Two wounds were nonlethal. One wound was potentially lethal if not treated within an hour. That bullet passed through the vertebral column, nicked the vena cava, and exited through the upper abdomen. Finally, the cause of death was a shot that entered the middle chest and travelled through the sternum, heart, and left lung.
 

 Barwick had six gunshot wounds, and again the medical examiner was unable to determine the order in which the rapid shots were fired. Four of the wounds were nonlethal. The fifth gunshot wound would have been lethal if not treated quickly; the bullet collapsed a lung. The sixth wound, however, was immediately lethal. That bullet traveled diagonally through her left lung, heart, diaphragm, abdomen, and liver.
 

 C. Penalty Phase: Mitigation
 

 In mitigation, the defense presented the testimony of family members and teachers regarding Allred’s academic and social development. Allred’s mother, Tora Allred, testified that her son was a happy child until about age five or six, when he became “a different child,” “hyper,” and “emotional.” She took him to a pediatrician, who she said found no physical problems but suggested Allred had been sexually abused; he referred her to a psychiatrist. The psychiatrist, however, found Allred had a “well-defined tic disorder” (licking his hand and rubbing his eye) and diagnosed attention deficit hyperactivity disorder (ADHD); he prescribed medication. Allred’s mother said that his personality showed in many of his school pictures in which he did not smile. Tora Allred also testified that appellant’s paternal grandparents lived either in their home or next door for most of his life. She stated that once — she did not specify when — appellant’s much older cousin filed a police report accusing this same grandfather of sexually molesting him, but she admitted that appellant had never made such an allegation.
 

 Regarding Allred’s progress in school, Tora Allred testified that in grade school, progress reports indicated that Allred was inattentive and did not do his work. Although it was suggested that Allred might have a learning disability, subsequent school testing revealed that he had a high IQ and qualified for gifted classes. Allred was less social than his brothers and quieter. He left school after eleventh grade and attended a community college to earn his high school diploma. Then, at another nearby college, he obtained a two-year degree in accounting.
 

 After graduating from high school, All-red lived alone in a large room that had been added downstairs in the family home. Only Allred had access to the room after he installed a deadbolt lock on the door. Appellant painted the walls and ceiling black and covered the windows with black curtains. At the time of the murders, Allred was essentially self-sufficient. He was employed full time teaching the use of software, and he paid for his own car and cell phone.
 

 
 *1276
 
 Allred and Tiffany Barwiek had a good relationship and were happy until the birthday breakup. In fact, on the day he turned twenty-one, Tiffany gave him a card that read, “Andrew, happy birthday. I am so happy I’ve spent the last year with you. I love you, hope you like your gift.” Tora Allred, however, also testified that after the breakup, Tiffany gave Allred a T-shirt that had “Failed” written on it. A rebuttal witness, however, subsequently testified at the Spencer
 
 [6]
 
 hearing that Tiffany gave Allred the T-shirt at his twentieth birthday party, a year before the murders. The word “failed” was Allred’s catchphrase, and the gift was “meant to be funny” because it was the word he used all the time. In fact, Allred laughed when he saw the shirt.
 

 Both of Allred’s parents testified that the family kept guns in the house for hunting and skeet and target shooting. Further, when Allred was younger, his father experienced a period in which he had a drinking problem that resulted in multiple DUIs and incidents of domestic violence. On one occasion, Allred’s drunken father threatened to shoot himself, and his mother struggled with her husband. The then twelve-year-old Allred observed this and called the police. As a result, his father was arrested. Finally, both parents were concerned about appellant after the breakup with Tiffany, and the weekend after the breakup, his father considered that appellant might commit suicide. All-red’s parents tried to encourage appellant, telling him that he would “get over” Tiffany.
 

 Allred’s paternal grandfather testified that he and his wife had lived with Allred’s family for ten years from the time Allred was a baby. Both grandparents then moved with their son’s family from Winter Park to Oviedo, where they lived on adjacent property. According to his grandfather, Allred studied, was good with his hands, and was a “computer nut.” Although he no longer lived next door, Allred visited him at his new home and brought Tiffany with him sometimes. He was not asked any questions about familial sexual abuse allegations.
 

 Three of Allred’s teachers testified regarding his school life. A grade school teacher stated that he made good grades but was frequently tired and slept in class. He was generally withdrawn and “standoffish,” preferring not to participate, and he had trouble making friends. A middle school teacher testified that he had an IQ of at least 130 and qualified for gifted classes. The school was a mix of rural students, such as Allred, and more cosmopolitan students who had computers and academically advanced parents. As a result, the second group often picked on Allred because he did not have a computer at home and he often wore the same clothes two days in a row. Allred was quiet and a loner; he had friends but none in the gifted program. He took fewer gifted classes in seventh grade and then dropped out of the program in the eighth grade. Allred’s high school web design teacher agreed that Allred was a loner but said he nevertheless made Bs and Cs in school.
 

 At the end of the hearing, victim impact statements from the victims’ families were read to the trial court. Afterwards, the prosecutor asked the trial court to inquire whether the defense intended to present mental health mitigation, noting that the defense hád listed an expert to testify.
 
 *1277
 
 The defense responded that after discussion and consultations, they determined not to present such testimony.
 

 D. Sentencing
 

 On November 19, 2008, Allred was present for his sentencing hearing. He declined, however, to address the court. The judge then sentenced Allred to death for the murders of Ruschak and Barwick. Allred was given life sentences for armed burglary of a dwelling while inflicting great bodily harm or death and for aggravated battery with a firearm while inflicting great bodily harm on Eric Roberts. Finally, appellant was sentenced to five years for criminal mischief. All sentences were ordered to be served concurrently.
 

 In sentencing Allred to death for the murders, the court found the following three aggravating factors and ascribed the weight indicated as to Allred’s murder of Michael Ruschak: (1) cold, calculated, and premeditated (CCP) — great weight; (2) murder committed while engaged in a burglary — little weight; and (3) prior capital or violent felony conviction (Barwick’s contemporaneous murder) — great weight. As to Barwick’s murder, the court found the following three aggravators and ascribed the weight indicated: (1) the murder was especially heinous, atrocious, or cruel (HAC) — great weight; (2) CCP — great weight; and (3) prior capital or violent felony conviction (Ruschak’s contemporaneous murder) — great weight.
 
 [7]
 
 The court also considered the following mitigating circumstances and ascribed the weight indicated: (1) defendant accepted responsibility by entering guilty pleas — little weight; (2) defendant cooperated with law enforcement-moderate weight; (3) defendant suffered from an emotional disturbance-moderate weight; (4) defendant’s emotional and developmental age was less than his chronological age — not established; (5) other factors including that defendant was likely sexually abused — not established; and (6) defendant’s developmental problems at a young age impacted his educational and social development— little weight.
 

 II. ISSUES ON APPEAL
 

 First, Allred challenges the trial court’s finding of the CCP aggravator as to both murders. Second, he challenges the HAC aggravator as to Barwick’s murder. In the third issue, appellant argues that the trial court erred in its findings regarding several mitigating factors and abused its discretion in assigning the appropriate weight to the mitigation. In addition to the issues raised by Allred, we review the voluntariness of Allred’s plea, an issue that we independently review when the defendant enters a guilty plea. Finally, we address Allred’s argument that his death sentences are not proportionate.
 

 A. CCP Aggravator
 

 Appellant argues that the CCP aggravator does not apply to either Ruschak’s or Barwick’s murder, claiming that each was a “classic ‘hot blooded’ murder,” there was no prearranged design to commit the murders, and there was evidence of an ongoing domestic dispute. As explained below, appellant’s arguments lack merit.
 

 In reviewing the trial court’s finding of an aggravator, we “review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.”
 
 Willacy v. State,
 
 
 *1278
 
 696 So.2d 693, 695 (Fla.1997). For CCP to apply, there must be a finding that
 

 the killing [was] the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
 

 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007) (citing
 
 Jackson v. State,
 
 648 So.2d 85, 89 (Fla.1994)). Further, “CCP can be indicated by the circumstances if they point to such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.”
 
 Farina v. State,
 
 801 So.2d 44, 54 (Fla.2001).
 

 The trial court found the murders of both Ruschak and Barwick to be CCP. As to Ruschak’s murder, the trial court found the following:
 

 The evidence, including the written messages from the defendant to the victim, to Tiffany Barwick, and to Michael Siler, the fact that the defendant purchased the .45 caliber pistol several days before the murders, and the fact that the defendant warned the victim that he was on his way to his location, establishes this aggravating factor beyond a reasonable doubt. The court rejects the defendant’s statement that he did not preplan the murders. The court assigns great weight to this aggravating circumstance.
 

 As to Barwick’s murder, the court made the same findings and rejected the claim that Allred did not preplan the murders.
 
 [8]
 
 The trial court added that “[Allred] stated that he knew Tiffany Barwick would be there [at the house] because she did not have anywhere else to be.”
 

 After reviewing Allred’s claim under the standard cited previously, we determine that the aggravator is valid. On the day of the murders — a month after the breakup with Barwick — appellant told his friend Michael Siler in an instant message exchange that he intended to kill both Barwick and Ruschak. In similar messages to his victims that day, appellant said that he would kill Ruschak the next time he saw him and that he could not forgive Barwick for having sex with Rusc-hak. This anger, however, was not evident when he had dinner with Siler that evening. Instead, Allred was quiet and passive. After dinner, Allred went home to his room, and he did not drink the beer he had just bought. He knew that both Rusc-hak and Barwick would be at Roberts’ house, and after a time, he sent a message telling Ruschak that he was coming to the house. Allred had purchased a gun after he turned twenty-one, but he always left it in his room unless he went to target practice. That evening, after sending his warning, he took his loaded gun with him. Upon arriving at the house, he repeatedly rammed Barwick’s car, and then he again picked up his gun and walked to the front door. Upon being denied entry at both the front and back doors, Allred did not leave. Instead, he fired his pistol to gain entry by shattering the glass door. He spoke to no one and did not threaten or shoot at any of the people present in the room. Instead, he went directly to the kitchen and gunned Ruschak down. When Roberts tried to stop Allred, appellant was “somewhat calm” when he told Roberts to release him and then fired a single, nonfatal shot into Roberts’ leg. Allred then
 
 *1279
 
 went to the bathroom where Barwick stood in the bathtub calling 911 and shot her six times. Thus, Allred only murdered the two people that he went to the house prepared to kill.
 

 Appellant contends that the trial court erred in finding that he purchased a gun “several days before the murders,” because appellant purchased the gun on September 1, took possession on September 7, and committed the murders on September 24. Regardless of whether “several days” can mean about two weeks, the fact remains that appellant purchased the gun soon after the breakup and practiced with it by using a picture of Barwick for a target. That Allred purposely took this gun with him to the crime scene is evidenced by his own admission that he never took it from his room unless he intended to use it. Thus, the court’s finding that All-red procured the weapon in advance is relevant to the CCP finding and supported by competent, substantial evidence.
 

 Citing our decision in
 
 Santos v. State,
 
 591 So.2d 160 (Fla.1991), appellant also argues that his actions on that day resulted from an ongoing domestic dispute and therefore were not “cold” and “calculated.” In that case, we stated that a murder arising from a domestic dispute tended to negate the CCP aggravator.
 
 Id.
 
 at 162. Then, upon finding, based on a mental health expert’s testimony, that the “ongoing, highly emotional domestic dispute” had “severely deranged” Santos and that he was under extreme emotional distress and unable to appreciate the criminality of his conduct, we struck the aggravator.
 
 Id.
 
 at 163.
 

 Appellant’s argument fails for two reasons. First, Allred presented no mental health testimony establishing that he was mentally impaired. Further, the record supports the trial court’s determinations that Allred was “suffering from an emotional disturbance” but that it was not severe or extreme and that appellant was able to conform his actions to the requirements of law.
 
 See Carter v. State,
 
 980 So.2d 473, 481-82 (Fla.2008) (affirming CCP where defendant was jealous that his longtime girlfriend was seeing someone else, drove to her house, carried his rifle with him to the door, confronted his victims, and then shot and killed both). Second, any reliance on a so-called “domestic disturbance exception” to CCP is unavailing. As this Court recently stated in
 
 Turner v. State,
 
 37 So.3d 212, 224 (Fla.2010),
 
 cert. denied,
 
 — U.S. -, 131 S.Ct. 426, 178 L.Ed.2d 332 (2010):
 

 Twelve years after the
 
 Santos
 
 decision, this Court made it clear in
 
 Lynch [v. State,
 
 841 So.2d 362, 377 (Fla.2003) ] that it “does not recognize a domestic dispute exception in connection with death penalty analysis.” Therefore, even if [a] murder did, in fact, “arise from a domestic disturbance,” such a defense would not preclude a finding of CCP.
 

 Accordingly, we hold the trial court applied the correct rule of law in finding the CCP aggravator as to both murders and that competent, substantial evidence supports the finding.
 

 B. HAC Aggravator
 

 In his second issue, Allred contends that the HAC aggravator does not apply to Barwick’s murder. Our cases have established that the HAC aggravator applies to a murder that is
 
 “both
 
 conscienceless or pitiless
 
 and
 
 unnecessarily torturous to the victim.”
 
 Richardson v. State,
 
 604 So.2d 1107, 1109 (Fla.1992). “HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, ... where a victim experiences the torturous anxiety and fear of impending death.”
 
 Barnhill v. State,
 
 834 So.2d 836, 849-50
 
 *1280
 
 (Fla.2002). Thus, the trial court considers “the victim’s perceptions of the circumstances as opposed to those of the perpetrator.”
 
 Lynch,
 
 841 So.2d at 369;
 
 accord Schoenwetter v. State,
 
 931 So.2d 857, 874 (Fla.2006). Further, the “victim’s mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances.”
 
 Swafford v. State,
 
 533 So.2d 270, 277 (Fla.1988).
 

 On appeal, Allred specifically argues that Barwick’s death from Allred’s rapid gunshots was nearly instantaneous and thus the victim’s fear of impending death could only have lasted a matter of seconds. In determining that HAC applied to Barwick’s murder, the trial court correctly acknowledged that “[generally, shooting deaths do not qualify as HAC because they are instantaneous, or nearly so ... unless the shooting is accompanied by additional acts resulting in mental or physical torture to the victim.” The trial court found that these additional factors were present in this case as follows:
 

 However, this aggravating circumstance will apply in cases where the victim is terrorized before being shot or endures fear and emotional strain or the infliction of mental anguish.
 
 Lynch v. State,
 
 841 So.2d 362, 369 (Fla.2003). All of these exceptional factors are present in this case and are forever memorialized in the 911 tape in evidence, during which the listener can hear the helpless victim anticipate her own death after hearing the other victim being shot, her pleas for assistance to the 911 operator, and her screams as she is repeatedly shot time and time again. This piece of evidence is the most horrific piece of evidence this court has heard in a homicide case in nearly twenty-three years as a trial judge. The fright and terror suffered by the victim during that 1:17 minute telephone call is difficult to imagine — yet it is plainly evident on the recording.
 

 As explained below, we hold that the trial court applied the correct rule of law and that competent, substantial evidence supports the finding that the HAC aggra-vator applies to Barwick’s murder. The facts are undisputed that Barwick was panic-stricken upon learning that Allred was coming to the house that night and that he had threatened to kill Ruschak in an instant message exchange'with Barwick earlier that day. When Allred fired his pistol through the glass door to gain entry, Barwick immediately hid in a bathroom. Although she did not see Allred pump four shots into Ruschak, killing him, she undoubtedly heard the screams of her helpless friends and Allred’s repeated gunshots. After all, Cochran testified that she heard all of this from the other bathroom where she hid in the small house. More importantly, in Barwick’s one-minute, seventeen-second 911 call, her voice moves quickly from panic and fright as she hears the gunshots outside the bathroom to desperate, indescribable screams of terror as Allred enters the bathroom and begins firing six shots into her body. Regardless of whether the fatal shot was the first of the six shots, the helpless victim clearly knew Allred was coming for her and fully recognized her impending death.
 

 The defendant argues that the 911 call was too short and thus negated the applicability of HAC, but we have held that the victim’s perception of imminent death need only last seconds for this aggravator to apply.
 
 Buzia v. State,
 
 926 So.2d 1203, 1214 (Fla.2006). Further, as explained above, the victim’s terror lasted longer than a few seconds. Recently, we affirmed the applicability of the HAC aggravator in a similar case. There, we stated that “[cjommon sense would indicate that an elderly woman confined to a wheelchair,
 
 *1281
 
 who is one room away from a brutal murder, and who witnesses her attacker walk into the room, face her and stab her through the heart with a ten-inch chefs knife would be ‘acutely aware’ of her ‘impending death.’”
 
 Aguirre-Jarquin v.
 
 State, 9 So.3d 593, 609 (Fla.2009) (quoting
 
 Buzia,
 
 926 So.2d at 1214),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 1505, 176 L.Ed.2d 118 (2010). Similarly, Barwick had no way out that night as she listened to the gunfire, and the 911 call makes it crystal clear that she was acutely aware of her impending death when Allred finally walked into that bathroom with his gun in hand and commenced firing at her. Accordingly, we hold that the trial court’s finding of this aggravator is supported by competent, substantial evidence and that the trial court correctly applied the law.
 

 C. Mitigation Claims
 

 Allred next takes issue with several of the trial court’s findings regarding mitigation and the weight the court ascribed. We address each of these claims in turn.
 

 As we have previously stated:
 

 The Court in
 
 Campbell v. State,
 
 571 So.2d 415 (Fla.1990), established relevant standards of review for mitigating circumstances: 1) Whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; 2) whether a mitigating circumstances has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and finally 3) the weight assigned to a mitigating circumstance is within the trial court’s discretion and subject to the abuse of discretion standard.
 

 Blanco v. State,
 
 706 So.2d 7, 10 (Fla.1997) (footnotes omitted).
 

 Allred first asserts that the trial court erred in ascribing little weight to the mitigating factor that he entered a guilty plea to all charges. Appellant argues that his plea, along with his waiver of a jury, greatly reduced the costs of the proceedings. Allred’s contention is without merit. As the trial court found, because of the number of witnesses to the crime, the plea certainly did not solve it. Further, while not having a jury trial was a savings, the State nevertheless had to present all guilt-phase evidence, including the testimony of fifteen witnesses, to establish the aggrava-tors beyond a reasonable doubt. Accordingly, the trial court did not abuse its discretion in assigning little weight to this circumstance.
 

 Appellant next takes issue with the trial court’s rejection of the statutory mitigator that he was under an extreme emotional disturbance at the time of the murders. The trial court did not err in rejecting this mitigator. The trial court found that although Allred suffered from an emotional disturbance, it was not extreme. As recited previously, there is ample evidence that on the evening of the murders Allred was upset by the breakup. But Allred was passive and indifferent during dinner that evening with a friend. Later, knowing where both of his victims were, he warned Ruschak that he was coming to the house. He deliberately took his gun with him and, upon arrival at the house, methodically killed the two people he went there to kill. Even when he struggled with Roberts, he was “somewhat calm.” He left, reported his crime, and cooperated with police. As the trial court found, the evidence indicates execution of a plan. There is no evidence of extreme emotional disturbance. Accordingly, the trial court’s rejection of the statutory miti-gator and its finding of the nonstatutory circumstance of emotional disturbance are supported by competent, substantial evidence. Further, the finding that Allred
 
 *1282
 
 experienced emotional distress does not, as appellant argues, negate the CCP aggravating factor. Finally, appellant has not demonstrated that the trial court abused its discretion in assigning this mitigation moderate weight.
 

 Allred also contends that the trial court improperly rejected his age at the time of the murders as valid mitigation. We have previously stated that “[i]n Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity).”
 
 Lebron v. State,
 
 982 So.2d 649, 660 (Fla.2008). Allred was twenty-one, had a high IQ, held a two-year college degree, had a high proficiency with computer technology, held a full-time job, and paid for his own car. The record is bereft of expert or lay testimony indicating that appellant was immature. Accordingly, the court’s rejection of this mitigator is supported by the record.
 

 Further, appellant takes issue with the trial court’s rejection of his contention that he was “likely” sexually abused as a child and the court’s findings regarding the long-term effect of his early developmental problems at age five or six. Appellant has not demonstrated error. First, because no evidence was presented that Allred was sexually abused, the trial court was correct to reject this proposed mitigating circumstance.
 
 [9]
 
 Second, the sentencing court found that although All-red’s developmental problems at an early age “hindered” Allred’s social development and “may have contributed” to his reaction to the breakup with Barwick, the problem did not impact Allred’s subsequent education. The record supports the finding of no impact on Allred’s later education. As previously stated, the record clearly shows that Allred had a high IQ, an A.A. degree, and high proficiency with computers. We conclude that the court’s rejection of the sexual abuse circumstance and its findings regarding the effect of the developmental problems are supported by competent, substantial evidence and that the court did not abuse its discretion in assigning the latter factor little weight.
 

 Finally, Allred contends that the trial court failed to consider as a mitigating circumstance the prior domestic violence in his home and his father’s drinking problem. Allred has not demonstrated error. Although the court “must expressly evaluate in its written order each mitigating circumstance proposed by the defendant,”
 
 Rogers v. State,
 
 783 So.2d 980, 995 (Fla.2001), “a defendant must raise a proposed nonstatutory mitigating circumstance before the trial court in order to challenge on appeal the trial court’s decision about that nonstatutory mitigating factor.”
 
 Davis v. State,
 
 2 So.3d 952, 962 (Fla.2008) (citing
 
 Lucas v. State,
 
 568 So.2d 18, 23-24 (Fla.1990)),
 
 cert. denied,
 
 — U.S. -, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009). In his sentencing memorandum, Allred did not specifically propose these factors of his home environment as separate, nonstatutory mitigating factors. Rather, he included discussion of his home life with regard to his claim of impaired social and educational development resulting from his developmental problems at age five or six.
 
 See Campbell v. State,
 
 571
 
 *1283
 
 So.2d 415, 419 n. 3 (Fla.1990) (“[P]roposed nonstatutory circumstances should generally be dealt with as categories of related conduct rather than as individual acts.”). Moreover, the order reflects elsewhere in the order’s findings of fact that the judge found Allred was exposed at age twelve to domestic violence between his parents at a time when his father was drinking excessively but that the family problems were “resolved long before” the murders occurred. Finally, any error is harmless. As evidenced by the trial court’s findings on this factor, the court would have assigned it minimal weight. Further, the trial court found minimal mitigation in this case and gave great weight to two significant aggravators in Ruschak’s murder (CCP and prior capital felony conviction) and to three in Barwick’s murder (HAC, CCP, and prior capital felony conviction).
 
 See Orme v. State,
 
 25 So.3d 536, 549 (Fla.2009) (“Even though the trial court erred in its treatment of this mitigator, we find the error harmless. The trial court found three significant aggravators — HAC, pecuniary gain, and commission during a sexual battery — compared to relatively weak mitigation. Even if we consider the difficult childhood with the other mitigation, it does not change the balance of the aggravating and mitigating circumstances.” (citation omitted)),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 3391, 177 L.Ed.2d 309 (2010);
 
 Taylor v. State,
 
 855 So.2d 1, 30 (Fla.2003) (“[E]ven if the trial judge erred in rejecting this factor as nonmitigating or in failing to assign any weight, any error would be harmless, given the minimal amount of mitigation this factor would have provided.”).
 

 D. Voluntariness of Guilty Plea
 

 In every death penalty case, this Court is required to determine whether competent, substantial evidence supports the murder conviction.
 
 See
 
 Fla. R.App. P. 9.140(1). When a defendant pleads guilty, however, we instead review the knowing, intelligent, and voluntary nature of the plea.
 
 Winkles v. State,
 
 894 So.2d 842, 847 (Fla.2005). “Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.”
 
 Ocha v. State,
 
 826 So.2d 956, 965 (Fla.2002).
 

 The record shows that the court informed appellant of the charges against him, and Allred acknowledged under oath that he had read, signed, and understood his written guilty plea. Upon questioning by the court, Allred stated that he (1) held an A.A. degree; (2) could read, write, and speak English; (3) was in good physical and mental health; and (4) had not consumed drugs or alcohol within twenty-four hours. The court specifically informed Allred of the rights he was waiving, including the rights to trial by jury, to cross-examine and call witnesses, to testify at trial, and to remain silent. Again, Allred acknowledged his understanding and stated that he had not been promised any reward for entry of the plea. In light of the trial court’s thorough plea colloquy, we hold that Allred knowingly and voluntarily entered his guilty plea and the trial court properly accepted it.
 

 E. Proportionality
 

 Finally, appellant claims that his death sentences are not proportionate. He argues that only two aggravators are valid and that the murders stemmed from an “ongoing and heated domestic dispute.” In
 
 Simmons v. State,
 
 934 So.2d 1100, 1122 (Fla.2006), we explained proportionality review as follows:
 

 
 *1284
 
 The Court performs a proportionality-review to prevent the imposition of “unusual” punishments contrary to article I, section 17 of the Florida Constitution.
 
 See Tillman v. State,
 
 591 So.2d 167, 169 (Fla.1991). “The death penalty is reserved for ‘the most aggravated and unmitigated of most serious crimes.’ ”
 
 Clark v. State,
 
 609 So.2d 513, 516 (Fla.1992) (quoting
 
 State v. Dixon,
 
 283 So.2d 1, 7 (Fla.1973)). In deciding whether death is a proportionate penalty, we consider the totality of the circumstances of the case and compare the case with other capital cases.
 
 See Urbin v. State,
 
 714 So.2d 411, 417 (Fla.1998). However, this proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Sexton v. State,
 
 775 So.2d 923, 935 (Fla.2000) (quoting
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990)).
 

 In this double homicide case, the court found three of the most serious aggravating factors — CCP, prior capital felony conviction, and HAC — applicable to Barwick’s murder and that the first two applied to Ruschak’s murder as well.
 
 See Jackson v. State,
 
 18 So.3d 1016, 1035 (Fla.2009) (stating HAC and CCP are “two of the most serious aggravators”),
 
 cert. denied,
 
 — U.S. -, 130 S.Ct. 1144, 175 L.Ed.2d 979 (2010);
 
 Chamberlain v. State,
 
 881 So.2d 1087, 1109 (Fla.2004) (“CCP and prior violent felony conviction are considered among the more serious aggravating circumstances.”). As explained previously, we reject Allred’s challenges to two of the aggravators. With regard to mitigation, the sentencing court gave moderate to little weight to the nonstatutory mitigating circumstances established and found the aggravators “far outweigh[ed]” the mitigation.
 

 We reject appellant’s argument that the sentences are disproportionate because they resulted from a domestic dispute. “This Court does not recognize a domestic dispute exception in connection with death penalty analysis.”
 
 Lynch,
 
 841 So.2d at 377. Under the totality of the circumstances and after comparison of this case with similar cases, we conclude that the death sentences in this double homicide case are proportionate.
 
 See Frances v. State,
 
 970 So.2d 806, 820-21 (Fla.2007) (affirming death sentences where two aggra-vators — prior capital felony conviction and committed in the course of a robbery— applied to both murders, HAC also applied to one victim, and one statutory mitigator and several nonstatutory mitigators were found);
 
 Lynch,
 
 841 So.2d at 368 (affirming death sentences for murders of girlfriend and her daughter where two aggrava-tors — prior violent felony conviction and commission during a felony — applied to both murders; a third aggravator — HAC in one and CCP in the other — applied in each; and one statutory and eight nonstat-utory mitigators were found);
 
 Francis v. State,
 
 808 So.2d 110, 141
 
 &
 
 n. 12 (Fla.2002) (affirming death sentences where four ag-gravators — prior capital felony conviction, committed while engaged in a robbery, HAC, and victim vulnerability due to advanced age — were found as to each; two statutory mitigators — defendant’s age and under extreme mental or emotional disturbance — were established; and nonstatuto-ry mitigators including mental illness or emotional disturbance, no significant prior violent criminal activity, and ability to conform to the law may have been impaired were found).
 

 III. CONCLUSION
 

 Based on the foregoing, we affirm All-red’s convictions for first-degree murder and his sentences of death.
 

 It is so ordered.
 

 
 *1285
 
 CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 .
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
 

 [2]
 

 . The trial judge wanted to assure Allred's availability to defense counsel. Accordingly, although Allred waived his presence in the courtroom during the penalty phase, he was nevertheless in the courthouse the first day and viewed the proceedings by live video from another room. On both of the subsequent two days, however, Allred was brought to the courthouse, where he waived his right to be at the courthouse and available to defense counsel and requested to be taken back to jail. The trial court granted the requests.
 

 [3]
 

 .Allred lived in a large room that his parents had added downstairs from their home. The room had a separate entrance from the house.
 

 [4]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [5]
 

 . Although appellant asked several times during the interview about the condition of his victims, the detectives did not inform him that they were dead.
 

 [6]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993). At the
 
 Spencer
 
 hearing, defense counsel presented a written waiver of Allred’s presence and right to speak. The only witness at the hearing was Charles Bateman.
 

 [7]
 

 . As to both murders, the trial court rejected the aggravating factor that Allred knowingly created a great risk to many persons because it was clear that "the defendant only intended to kill Tiffany Barwick and Michael Rusc-hak.”
 

 [8]
 

 . The court also wrote that the defendant warned Ruschak that he was coming to the house, thus clarifying that Barwick did not directly receive that warning from Allred.
 

 [9]
 

 . The contention was based on mere conjecture from the following disparate facts: (1) Allred's paternal grandparents lived with the family for ten years from the time Allred was a baby; (2) Allred was five or six when he became "hyper" and emotional; (3) the physician found no physical problems but suggested the possibility of sexual abuse and referred him to a psychiatrist; (4) the psychiatrist diagnosed Allred with ADHD; and (5) at some point in time, Allred's much older cousin accused their grandfather of sexual abuse and their grandfather denied it.