# Supreme Court of Florida

_____

No. SC18-2014
_____

**JAMES TERRY COLLEY, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

November 25, 2020

PER CURIAM.

James Terry Colley, Jr. appeals two first-degree murder convictions and two corresponding sentences of death.[1] We affirm the convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

### I. Guilt Phase

The jury in this case found Colley guilty of murdering his estranged wife, Amanda Cloaninger Colley, and Amanda's friend Lindy Dobbins. At the time of the murders, Colley was subject to a domestic violence injunction restricting his contact with Amanda. In fact, less than two hours before committing the murders,

_____

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Colley personally appeared at a court hearing about an earlier violation of that injunction. We recount the hours leading up to the murders in some detail, because the sequence of events is relevant to the arguments Colley raises on appeal.

At the time of the murders, Colley was living in his sister's house on Garrison Drive in St. Augustine. Amanda still lived in the marital home on South Bellagio Drive, about fifteen miles away. Although he was dating someone else, Colley hoped he would reconcile with Amanda. Colley suspected that Amanda was dating, but she had refused to admit that to him.

Around 4 a.m. on August 27, 2015, Colley drove to Amanda's house, unaware that Amanda was not there. Colley searched the empty home and found sex toys and men's polo shirts. His suspicions confirmed, Colley ransacked the house, smashing television sets and dumping trash on the floor. Afterward, Colley briefly visited a friend a few houses down the street (to tell the friend what he had discovered), and he eventually returned to his sister's home on Garrison Drive. Colley also placed multiple phone calls to Amanda, most of which went unanswered.

Amanda returned to her home at about 9 a.m. She FaceTimed her boyfriend, Lamar Douberly, to show him what Colley had done. Lamar drove to Amanda's and called the police nonemergency line to make a report. A public service assistance officer arrived at 9:55 a.m. and observed the damage. Amanda told the

officer she did not want to file any formal charges against Colley until she spoke with her mother and attorney, so the officer left. Two of Amanda's friends, Lindy Dobbins (the other murder victim) and Rachel Hendricks, arrived minutes later.

Meanwhile, at about the same time that Amanda was returning to her home, Colley arrived at the courthouse for a hearing on an unrelated violation of his domestic violence injunction. In video footage of the hearing, Colley appeared calm and cooperative. After a colloquy in which Colley, among other things, denied being under the influence of any intoxicants, the trial judge allowed Colley to plead no contest to the charged violation.

Colley left the courthouse a little before 9:30 a.m. and once again began calling Amanda. After several calls and voicemails, Amanda finally answered at 9:41 a.m. She and Colley spoke for roughly fourteen minutes.

Having departed the courthouse, Colley drove to a gas station near his sister's house, went to his sister's home, and then briefly returned to the same gas station, where he bought a small amount of gas and some items from the store. The evidence at trial supported an inference that Colley retrieved ammunition during his brief stop at his sister's house. The parties disputed whether he also retrieved guns there, or whether he already had guns in the car he was driving. Regardless, shortly after 10 a.m., Colley started the twenty-minute drive back to Amanda's home.

On his way to Amanda's, Colley had a phone conversation with his father. A dog walker who was near Colley's father at the time overheard the call. She testified that she heard Colley's father pleading, "Please, please son, come back and get your truck. Everybody knows what you've been through." To which the person on the other end of the call responded, "I just can't f***ing take this anymore."

Instead of going directly to Amanda's home, Colley drove to an adjacent street and parked his car at an unoccupied house. From there, he crossed a berm and walked along a trail that ran parallel to Amanda's fenced-in backyard. He was armed with two handguns, a 9mm and a .45 caliber.

Colley approached the back of Amanda's house and began shooting from the outside. Amanda, Lamar, Lindy, and Rachel were inside. Hearing the sound of gunshots and the shattering back-door glass, Lamar shouted for everyone to run. Lamar himself ran out of the house through the garage. Fatefully, the women all ran to the home's master bedroom area. Amanda hid in the bathroom. Lindy and Rachel barricaded themselves in the closet. At 10:36 a.m., Amanda and Lindy separately called 911 from their cellphones.

Shouting "where is he, where is he," Colley entered the home through the shattered back glass doors. Colley first found Amanda. He screamed at her and demanded to know where "he" was. Amanda said she did not know and begged

Colley to put down his gun. Colley then tried to open the door to the closet, but Rachel held the door shut with her foot. A crying Amanda told Colley that only Rachel and Lindy were in the closet, which prompted Lindy to say, "It's Lindy in here. It's Lindy!"

Colley returned to the bathroom and shot Amanda—but not fatally. He then went back to the closet. Again unable to open the closet door, this time Colley fired a shot through the door. The bullet grazed Rachel's arm, causing her to let go of the door. As Rachel ran out of the closet, Colley entered it and walked to where Lindy was crouched down, hiding behind a chest. Colley shot and killed her.

Amanda was still in the bathroom. So Colley went back there and shot her three more times, until his 9mm was out of bullets. Colley dropped the 9mm and shot Amanda five more times, using the .45.

Colley then left the home, returned to his sister's house on Garrison Drive, abandoned his cell phone, and fled the area. Police officers arrested Colley hours later after a traffic stop in Norton, Virginia.

Colley was charged with the first-degree murder of Amanda Colley; the first-degree murder of Lindy Dobbins; the attempted first-degree murder of Lamar Douberly; the attempted first-degree murder of Rachel Hendricks; burglary with an assault or battery; burglary of a dwelling; and aggravated stalking after an injunction.

At trial the State proved its case principally through Rachel Hendricks' and Lamar Douberly's testimony and through cell phone and video records that documented Colley's actions in the hours leading up to the murders. Dr. Predrag Bulic, the St. Johns County chief medical examiner, testified about the autopsies performed on the murder victims. Amanda sustained nine gunshot wounds: two in the chest area, two in the abdomen, three in the right leg, one in the right hand, and one in the left hand. Amanda's wounds showed that the shots had traveled different trajectories. Some had followed a slight downward trajectory, consistent with both the shooter and the victim standing up at the time of the gunshots. Other bullets traveled through Amanda's body at an upward trajectory, indicating that she was lying horizontal on the ground when shot.

Dr. Bulic inferred that Amanda suffered multiple gun shots in advance of sustaining one shot that would have paralyzed her from the neck down and another that would have been instantaneously lethal. Specifically, Amanda's arms and legs showed several defensive wounds that could only have been inflicted while Amanda was still capable of movement. When asked whether Amanda was conscious of what was happening, Dr. Bulic testified, "She was aware. She had a—a knowledge of what's happening and—through the entire shooting process."

As to Lindy, Dr. Bulic testified that she sustained three gunshot wounds: one on the right temple, one on the right shoulder, and one on the left foot. The

trajectory of the shoulder and temple gunshots had followed a steep downward angle, consistent with the shooter being above the victim. Both of these gunshots were immediately lethal.

In its closing, the defense argued that the State had not proven premeditation and that therefore the jury should not find Colley guilty of first-degree murder and attempted murder. The defense's theory was that Colley had been on "an emotional rollercoaster" because of the uncertain status of his relationship with Amanda and that the killings were a "snap reaction." Defense counsel argued that Colley did not go to Amanda's home with the intention of killing anyone. Defense counsel speculated that something set Colley off—counsel did not know what—only after Colley arrived at Amanda's home.

On July 18, 2018, the jury unanimously found Colley guilty of first-degree premeditated and first-degree felony murder of Amanda Colley; first-degree premeditated and first-degree felony murder of Lindy Dobbins; attempted first-degree murder of Lamar Douberly; attempted felony murder of Rachel Hendricks; burglary of a dwelling with an assault or battery; burglary of a dwelling; and aggravated stalking after an injunction.

## II.    Penalty Phase

On July 23, 2018, the same jury returned for the penalty phase on Colley's murder convictions. The State presented four victim impact statements (two for

each victim) but did not otherwise supplement the guilt phase evidence. The defense focused on Colley's state of mind and claimed that he had been impaired as a result of taking Ambien early in the morning of the murders.

*Defense Penalty Phase Case*

Colley presented the testimony of three expert and eight lay witnesses. The experts focused on Colley's alleged impairment. The lay witnesses testified about Colley's character and reputation in the community.

Through Colley's mitigation experts, the jury heard Colley's version of what happened the morning of the murders. Colley told the experts that he had consumed alcohol and cocaine the night before he ransacked Amanda's house. Colley said that he had spoken with Amanda in the predawn hours and offered to pay for the damage he had done, and that Amanda had agreed not to call the police to report the incident. Colley also said that he took one or two Ambien tablets around 5 a.m. and that his father later woke him up to attend the 9:00 a.m. court hearing.

Consistent with the State's evidence, Colley told his experts that he had spoken with Amanda after the court hearing and visited a gas station and his sister's house before driving to Amanda's. But Colley claimed that he had initially approached the back of the house unarmed, only to have a panic attack when he

saw a man through the window. That prompted Colley to walk back to his car, retrieve his guns, and ultimately carry out the killings.

Dr. Mark Mills, a forensic psychiatrist, opined that Colley was substantially impaired during the murders because he was experiencing an Ambien side effect called parasomnia. Dr. Mills described parasomnia as a sleep disorder where someone seems to be acting in a rational way, but later has no recollection of his or her actions. Dr. Mills based his opinion largely on the fact that, when he interviewed Colley in October 2017 (approximately two years after the murders), Colley reported having stroboscopic memory—remembering only flashes of what happened the day of the murders.

Dr. Michele Quiroga, a clinical and forensic neuropsychologist, testified that Colley suffers from depression, anxiety, and panic attacks, and that Colley was taking antidepressants in August 2015 (the month of the murders) and self-medicating with alcohol. Dr. Quiroga did not give an opinion as to impairment.

Last, Dr. Daniel Buffington, a clinical pharmacologist, gave testimony similar to Dr. Mills's. Dr. Buffington described parasomnia and opined that Colley's snapshot memory from the Ambien and other prescriptions (Colley was taking antidepressants and sleep disorder and pain medications) showed that Colley was substantially impaired at the time of the murders.

As for the lay witnesses, Colley's two sisters testified that he grew up in a normal home with a very close-knit family. They described Colley as having a strong work ethic from a young age and being gainfully employed his entire life. They said that Colley was a great hands-on father to his two kids. They described Colley's volunteer work and mentorships. They explained that Colley had struggled with alcohol abuse for several years. One of the sisters mentioned that as a child Colley had witnessed two incidents of domestic violence between his parents. Two cousins and a brother-in-law attested to Colley being a good father and uncle. A neighbor explained that Colley was involved in the community by coaching his son's football and baseball teams. One of Colley's friends testified that Colley had always been good to his family. And two former coworkers described Colley as a good friend and very family-oriented.

*State's Rebuttal*

To refute the claim that Colley was impaired at the time of the murders, the State presented the testimony of two witnesses: Jeffrey Danzinger, a forensic psychiatrist, and Judge Charles Tinlin, who presided over Colley's injunction violation hearing the morning of the murders.

Dr. Danzinger described parasomnia as an abnormal event or experience during sleep. He explained that any side effects from Ambien are rare and uncommon. He said that people in a parasomnia state sometimes are able to

engage in behaviors like sleepwalking or driving a car, but generally these behaviors are poorly coordinated. And, to a layperson, those in such a state would appear confused, dazed, and obviously impaired.

Dr. Danzinger explained the basis for his opinion that Colley was neither impaired by substances nor suffering from any parasomnia or sleep disorder at the time of the murders. First, he noted that Colley's behavior was completely normal from the time his medications were prescribed until the day of the murders. Second, he believed Colley's behavior at the courthouse an hour before the murders was completely inconsistent with someone in a parasomnia state; Colley was able to coherently, logically, and appropriately engage in a plea colloquy with Judge Tinlin. Dr. Danziger noted that at the hearing Colley asked the court several questions unique to his case which, to Dr. Danzinger, indicated Colley was clearheaded and thinking logically. Finally, Dr. Danziger relied on the fact that, in an interview with a psychologist in November 2015 (approximately ninety-days after the murders), Colley described the murders but did not report any memory loss.

Judge Tinlin testified that he had no concerns that Colley was impaired during the injunction violation hearing and that he would not have accepted a plea if Colley had exhibited any signs of intoxication. The judge recalled that Colley's

demeanor was fine. Colley asked questions, gave appropriate responses, and seemed alert and intelligent.

During Judge Tinlin's testimony, the State introduced the video recording of the hearing. The video showed Colley answering various questions in order to enter a plea of no contest. Colley testified (under oath) about his job and education level, and he answered "no" when asked if he was under the influence of any intoxicants. Colley also voluntarily asked several questions throughout the proceeding that were specific to his probation and court fees.

*Jury Findings and Recommendation*

The jury unanimously found four aggravating factors proven beyond a reasonable doubt for each of the two murder convictions: (1) Colley was previously convicted of another capital or violent felony (the contemporaneous murders and attempted murders); (2) Colley committed each murder while engaged in the commission of a burglary; (3) each murder was especially heinous, atrocious, or cruel; and (4) Colley committed each murder in a cold, calculated, and premeditated manner, without any pretense of moral or legal justification. The jury found one additional aggravating factor applicable to Amanda's murder: (5) Colley committed the murder while subject to a domestic violence injunction and the victim of the murder was the person who obtained the injunction. After performing the statutorily required assessment and weighing of aggravating factors

and mitigating circumstances, the jury unanimously recommended that the trial court impose a death sentence for each murder.

### III.   Spencer Hearing

The court held a *Spencer*[2] hearing on October 2, 2018.  The State did not put on any additional evidence at the hearing.  The defense called one witness, Sam Williams, the director of corrections for the St. Johns County sheriff's office. Williams testified that he had not heard of Colley causing problems while incarcerated, other than two minor disciplinary writeups.  The court also heard from Colley himself.  Colley said, "This was a horrible, terrible accident and I wish it was different, but it's not.  And I'm sorry for all parties involved."  The defense submitted various letters from friends and family.

### IV.   Sentencing

The trial court held a sentencing hearing on November 30, 2018.  The court found that the State had proven beyond a reasonable doubt all five aggravating

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

factors[3] for Amanda Colley's murder (count I) and all four aggravating factors[4] for Lindy Dobbins's murder (count II). The court further found that the defense had established twenty-three mitigating circumstances by the greater weight of the evidence.[5] The court concluded that the proven aggravators in the case "far

---

3. The trial court assigned the following weight to the aggravating factors for Amanda's murder: (1) Colley was previously convicted of another capital or violent felony (the contemporaneous murder and the attempted murders) (great weight); (2) the capital felony was committed while Colley was engaged in the commission of a burglary (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight); (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (moderate weight); (5) the capital felony was committed by a person subject to an injunction and was committed against the petitioner who obtained the injunction (great weight).

4. The trial court assigned the following weight to the aggravating factors for Lindy's murder: (1) Colley was previously convicted of another capital or violent felony (the contemporaneous murder and the attempted murders of Lamar Douberly and Rachel Hendricks) (great weight); (2) the capital felony was committed while Colley was engaged in the commission of a burglary (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (great weight); (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (moderate weight).

5. The trial court assigned the following weight to the mitigating circumstances: (1) Colley was a good father to his children (very slight weight); (2) Colley was a good worker (slight weight); (3) Colley was a good son (slight weight); (4) Colley was a good brother (slight weight); (5) Colley was gainfully employed at the time of his arrest (slight weight); (6) Colley has maintained stable employment (slight weight); (7) Colley was a mentor to fellow employees (slight weight); (8) Colley did various charitable works through his employment (slight weight); (9) Colley was a great uncle (slight weight); (10) Colley witnessed domestic violence by his mother on his father as a child (slight weight); (11) Colley has a history of drug and chronic alcohol abuse (moderate weight); (12)

- 14 -

outweigh[ed]" the mitigating circumstances. Accordingly, the court sentenced

Colley to death for each murder and imposed sentences for Colley's other

convictions, to run concurrently with the death sentences.[6] This direct appeal

followed.

## ANALYSIS

Colley raises the following claims on appeal: (1) the trial court erred in

instructing on and finding the CCP aggravator; (2) the trial court erred in

instructing on and finding the HAC aggravator; (3) Florida's death penalty statute

---

Colley is impulsive (slight weight); (13) Colley loves animals (very slight weight); (14) Colley was a positive influence on other children in the neighborhood (very slight weight); (15) Colley volunteered as a baseball coach (slight weight); (16) Colley volunteered as a football coach (slight weight); (17) Colley was previously active in race car driving (slight weight); (18) Colley tried to go through marriage counseling with his wife (slight weight); (19) Colley was taking pain, antidepressant, and sleep disorder medications at the time of the homicides (slight weight); (20) Colley had previously been diagnosed with depression (moderate weight); (21) Colley has adjusted well to his incarceration since being arrested in this case (slight weight); (22) Colley has no prior felony convictions prior to the date of the incidents in this case (moderate weight); (23) the existence of any other factors in Colley's character, background, or life or the circumstances of the offense that would mitigate against the imposition of the death penalty (slight weight).

6. For the attempted first-degree murder of Lamar Douberly (count III), the court sentenced Colley to life in prison, with a twenty-year mandatory minimum. For the attempted first-degree felony murder of Rachel Hendricks (count IV), the court sentenced Colley to life in prison, with a twenty-year mandatory minimum. For burglary of a dwelling with an assault or battery with a firearm (count V), the court sentenced Colley to life in prison, with a lifetime mandatory minimum. For burglary of a dwelling (count VI), the court sentenced Colley to fifteen years. And for aggravated stalking (count VII), the court sentenced Colley to five years.

fails to genuinely narrow the class of persons eligible for the death penalty and is

therefore unconstitutional; (4) the trial court abused its discretion in rejecting

Colley's two proposed impairment mitigators; (5) the trial court erred in allowing

victim impact evidence in general and in allowing the victim impact statement

"think of all of the lives she has blessed" to be read to the jury; (6) the prosecutor's

penalty phase closing argument violated Colley's constitutional rights; and (7)

Colley's death sentences are a disproportionate punishment.[7]  As we must, we also

consider whether there is sufficient evidence to sustain Colley's murder

convictions.

## I.    CCP

Colley challenges the trial court's finding that the murders were committed

in a cold, calculated, and premeditated manner without any pretense of moral or

legal justification (CCP).  § 921.141(6)(i), Fla. Stat. (2019).[8]  We have held that,

in order to establish the CCP aggravator, the evidence must satisfy a four-part test:

> (1) [T]he killing must have been the product of cool and calm reflection
> and not an act prompted by emotional frenzy, panic, or a fit of rage
> (cold); and (2) the defendant must have had a careful plan or
> prearranged design to commit murder before the fatal incident

7.  We recently held in *Lawrence v. State*, 45 Fla. L. Weekly S277 (Fla. Oct. 29, 2020), that this Court lacks constitutional or statutory authority to conduct proportionality review.  Therefore, we deny Colley's proportionality claim without further discussion.

8.  In his argument, Colley does not distinguish between the CCP findings as applied to each of the two murder victims.

(calculated); and (3) the defendant must have exhibited heightened premeditation (premeditated); and (4) there must have been no pretense of moral or legal justification.

*Lynch v. State*, 841 So. 2d 362, 371 (Fla. 2003) (citing *Evans v. State*, 800 So. 2d 182, 192 (Fla. 2001)); *see* § 921.141(6)(i), Fla. Stat. (2018).  Our task here is not to reweigh the evidence before the trial court.  Instead, the scope of our review is limited to whether the trial court applied the correct rule of law and, if so, whether competent, substantial evidence supports the trial court's finding.  *See England v. State*, 940 So. 2d 389, 403 (Fla. 2006).  "A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances." *Gill v. State*, 14 So. 3d 946, 962 (Fla. 2009) (citing *Hudson v. State*, 992 So. 2d 96, 116 (Fla. 2008)).

Colley claims that two of the four CCP elements were not met here.  First, Colley maintains that the murders were not "cold" because he committed the murders during the emotional upset of his deteriorating marriage and while he was under the influence of the alcohol and drugs he had consumed in the hours before the killings.  He characterizes the murders as having been committed "in the heat of passion."  Second, Colley speculates that he was set off by a phone call with Amanda less than an hour before the murders, and that this period of time is insufficient to establish heightened premeditation.  We disagree with both arguments.

- 17 -

To begin, "we have explicitly held that a finding of mental and emotional distress and the domestic nature of a murder do not preclude a finding of CCP." *Kopsho v. State*, 84 So. 3d 204, 216 (Fla. 2012). And even accepting Colley's contention that he had less than an hour to reflect on his plan to kill, under our case law that amount of time can satisfy the CCP aggravator's heightened premeditation requirement. In *Lynch v. State*, 841 So. 2d 362, 373 (Fla. 2003), for example, the defendant arrived armed at the victim's apartment and waited "thirty to forty minutes" for her to arrive. We held that this supported a heightened premeditation finding "regardless of what [the defendant's] intentions might have been prior to [the victim's] arrival." *Id.* In *Lynch* we further found heightened premeditation because five to seven minutes elapsed between the first injury to the victim and the firing of the fatal shot, enough time for the defendant to "reflect" and "leave the scene." *Id*; *see also Brown v. State*, 126 So. 3d 211, 218-19 (Fla. 2013) (finding heightened premeditation where defendant had "forty-five minutes to an hour" to reflect on contemplated murder). By citing these cases here, we do not suggest that there is any bright-line rule for how much reflection suffices to establish a defendant's heightened premeditation; the point is simply that our case law does not support Colley's argument on this issue.

Looking at the totality of the circumstances, as we must, we conclude that competent, substantial evidence supports the trial court's finding of the CCP

aggravator. The State presented evidence that Colley calmly and rationally participated in a court hearing less than two hours before the murders; that Colley calmly shopped at a gas station less than a half hour before the murders; that Colley armed himself in advance of traveling to the murder location; that Colley had a twenty-minute car drive during which to contemplate his intended actions; that Colley rejected his father's plea shortly before the murders to turn back; that Colley approached the murder scene in a manner designed to conceal himself; that Colley began shooting from outside his estranged wife's home; and that the victims of Colley's rampage did not provoke him in any way. Collectively, these facts easily establish that competent, substantial evidence supports the trial court's findings on the CCP aggravator. *See Marquardt v. State*, 156 So. 3d 464, 487 (Fla. 2015) (the "cold" element was satisfied where the evidence showed that "Marquart began shooting [the victim] even before he entered the house, and thus, there was no opportunity for provocation").

Indeed, we find this case closely analogous to *Silvia v. State*, 60 So. 3d 959 (Fla. 2011). Like Colley, the defendant in *Silvia* murdered his estranged wife. The couple had separated two months before the murder, and Silvia had repeatedly tried to reconcile with his wife. The day of the murder, Silvia purchased a shotgun and ammunition. Hours later he went to his wife's home and made a final plea for reconciliation. When the wife refused, Silvia walked one hundred feet to his car,

- 19 -

retrieved his shotgun, and returned to carry out the killing. Concluding that

Silvia's actions "reflect[ed] a deliberate and conscious choice to commit murder,"

*id*. at 970, we found that the evidence satisfied the CCP aggravator. So too here.[9]

## II.    HAC

Next, Colley claims that the trial court erred in finding that the murders were

especially heinous, atrocious, or cruel (HAC). We disagree.

The HAC aggravator applies to murders that are "both conscienceless or

pitiless and unnecessarily torturous to the victim." *Francis v. State*, 808 So. 2d

110, 134 (Fla. 2001). The focus is on the means and manner by which death is

inflicted and on the immediate circumstances surrounding the death. *Buzia v.*

*State*, 926 So. 2d 1203, 1211 (Fla. 2006). Gunshot murders can qualify as HAC if

the events preceding the death cause the victim fear, emotional strain, and terror.

*See Marquardt*, 156 So. 3d at 488; *Lynch*, 841 So. 2d at 369. To support HAC, the

evidence must show that the victim was conscious and aware of impending death.

*King v. State*, 130 So. 3d 676, 684 (Fla. 2013). "However, the victim's perception

---

9. Given our conclusion that competent, substantial evidence supports the trial court's CCP finding, Colley's claim that the trial court erred by instructing the jury on this aggravator necessarily fails. *See Diaz v. State*, 860 So. 2d 960, 965 n.6 (Fla. 2003) (trial court may give a requested jury instruction on an aggravating factor if the evidence adduced at trial is legally sufficient to support a finding of that factor.)

of imminent death need only last seconds for this aggravator to apply." *Gonzalez v. State*, 136 So. 3d 1125, 1162 (Fla. 2014); *see also Buzia*, 926 So. 2d at 1214.

Colley claims that HAC does not apply to either victim's murder because there is no evidence that the victims experienced terror and fear prior to their deaths. He maintains that "all of the killing was accomplished in under a minute," so neither murder victim had much time to agonize over her impending death. Colley also disputes the trial court's finding that Colley shot Amanda once, then killed Lindy, then returned to kill Amanda. He claims that the evidence shows that he shot and killed Lindy first and only then proceeded to shoot and kill Amanda. Colley's takeaway is that Lindy therefore did not hear her friend being shot and that Amanda had only seconds to contemplate Lindy's shooting before being shot herself. Colley says that if this Court upholds HAC here, the aggravator will be so broad as to apply in every case.

Colley's arguments are unpersuasive. For starters, this Court's role is not to reweigh the evidence, and the trial court's findings as to the sequence of the shootings are supported by testimony from Rachel Hendricks and the medical examiner. And their testimony strongly supports an inference that the murder victims experienced terror in the moments preceding their deaths. Both women fled to the master bedroom area only after being shot at by Colley from outside the house. They knew that Colley was on a murderous rampage. After Colley found

- 21 -

Amanda, he shot her once, left her to kill Lindy, and then returned to inflict the gunshots that caused Amanda's death. The medical examiner testified that Amanda likely sustained painful wounds before the shot that killed her. Similarly, Lindy cowered in fear behind a chest, heard her friend being shot, and then was executed upon Colley's return to the closet. The totality of these circumstances demonstrates that both murder victims experienced exceptional anguish before their deaths. *See Allred v. State*, 55 So. 3d 1267, 1280 (Fla. 2010) (upholding HAC where the defendant entered victim's home by shooting the glass doors, causing the victim to hide in the bathroom, where she "undoubtedly heard the screams of her helpless friends and [the defendant]'s repeated gunshots" before being shot six times). Colley's argument that facts like these are common to all first-degree murders is untenable. We deny relief on this claim.[10]

### III. Constitutionality of Florida's Capital Sentencing Scheme

Colley next claims that Florida's current death penalty statute is unconstitutional because it fails to genuinely narrow the class of cases eligible for death. He argues that legislative enactments have expanded the number of

---

10. Given our conclusion on the sufficiency of the evidence underlying the trial court's finding, we necessarily reject Colley's argument that the court erred by instructing the jury on the HAC aggravator. Similarly, we need not address Colley's argument that his Sixth and Eighth Amendment rights were violated when the penalty phase jury was instructed on an assertedly unsupported statutory aggravator (either CCP or HAC).

aggravating factors to the point where every first-degree murder conviction is eligible for a death sentence, in violation of the Supreme Court's mandate in *Furman v. Georgia*, 408 U.S. 238 (1972). Colley also challenges the HAC aggravator as unconstitutionally vague and overbroad.

Colley's arguments are ones that this Court has repeatedly rejected. *See Miller v. State*, 926 So. 2d 1243, 1260 (Fla. 2006) (rejecting the argument that "Florida's capital felony sentencing statute is unconstitutional because every person who is convicted of first-degree felony murder automatically qualifies for the aggravating circumstance of commission during the course of an enumerated felony."); *Ault v. State*, 866 So. 2d 674, 686 (Fla. 2003) (rejecting the argument that the murder in the course of a felony aggravator is unconstitutional because it constitutes an automatic aggravator and does not narrow classes of persons eligible for the death penalty); *see also Victorino v. State*, 23 So. 3d 87, 104 (Fla. 2009) (rejecting the claim that the HAC aggravator is unconstitutionally vague and overbroad). We decline to revisit these precedents here.

## IV. Impairment Mitigation

Colley next argues that the trial court abused its discretion in rejecting his two proposed mitigators, namely that (1) Colley was impaired at the time of the murders and (2) Colley's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, *see*

§ 921.141(7)(f), Fla. Stat. Colley argues that the evidence shows that he was impaired by a combination of stress and alcohol and drug use, including being in a state of parasomnia from having taken Ambien early in the morning of the murders. Colley claims that the trial court failed both to take into consideration his alcohol and prescription drug intake and to point to *any* evidence contradicting the proposed impairment mitigators.

A trial court must expressly evaluate all statutory and nonstatutory mitigators a defendant has proposed. *Allen v. State*, 137 So. 3d 946, 964 (Fla. 2013). It must find a proposed mitigating circumstance when the defendant has established that mitigator by the greater weight of the evidence. *See Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990). However, a trial court may reject a mitigator if the defendant fails to prove the mitigating circumstance, or if the record contains competent, substantial evidence supporting that rejection. *See Ault v. State*, 53 So. 3d 175, 186 (Fla. 2010). A mitigator may also be rejected if the testimony supporting it is not substantiated by the actions of the defendant, or if the testimony supporting it conflicts with other evidence. *See Douglas v. State*, 878 So. 2d 1246, 1257 (Fla. 2004). Even expert evidence can be rejected if that evidence cannot be reconciled with other evidence in the case. *Bright v. State*, 299 So. 3d 985 (Fla. 2020).

Here we find that competent, substantial evidence supports the trial court's rejection of Colley's two proposed impairment mitigators. Colley sought to establish these mitigators through the testimony of Drs. Mills and Buffington. These experts based their opinions largely on interviews with Colley a couple of years after the murders, in which Colley self-reported memory loss.

But the State rebutted that evidence with testimony from Dr. Danzinger and Judge Tinlin. Dr. Danzinger testified that the side effects of Ambien are rare and that a person in a parasomnia state "would not be able to engage in very complex discussions, such as behaving themselves and acting appropriately in a courtroom." Judge Tinlin, who went through an in-person plea colloquy with Colley only ninety minutes before the murders, testified that he had no concerns that Colley was impaired that day. He asked Colley a series of questions, all while Colley was under oath. One of the questions was whether he was under the influence of any intoxicants, to which Colley responded "no." During Judge Tinlin's testimony, the State introduced the video recording of Colley's injunction violation proceeding. In the video, Colley stands alert and focused next to his attorney, and throughout the proceeding Colley voluntarily asks and answers questions.

We find that competent, substantial evidence supports the trial court's rejection of Colley's proposed impairment mitigators. Specifically, we note Colley's demeanor at the injunction hearing, his normal behavior at the gas station

minutes before the murders (also recorded on video), and his actions after the murders (abandoning his cell phone and fleeing the state). All of this evidence is inconsistent with a person being in a state of parasomnia and unable either to appreciate the criminality of his conduct or to conform his behavior to the requirements of the law. We also note the trial court's finding that Colley's own penalty phase experts testified that any alcohol and cocaine that Colley consumed in the predawn hours were no longer affecting him at the time of the murders. We deny this claim.

## V.    Victim Impact Statements

Colley next challenges the trial court's admission of victim impact statements. First, he argues that *all* victim impact evidence should be impermissible. And second, he argues that the trial court here abused its discretion by allowing the jury to hear the following statement from Beth Kennedy, one of the victim impact witnesses: "Please think about Amanda and all of the lives she has blessed." We review a trial court's decision to admit victim impact testimony for abuse of discretion. *Kalisz v. State*, 124 So. 3d 185, 211 (Fla. 2013).

First, this Court already has rejected similar constitutional challenges to the admissibility of victim impact evidence in the penalty phase of a trial. *See Stein v. State*, 632 So. 2d 1361 (Fla. 1994); *Windom v. State*, 656 So. 2d 432, 438 (Fla.

- 26 -

1995); *Floyd v. State,* 850 So. 2d 383, 407 (Fla. 2002).  We decline to revisit these precedents here.

Second, we see no infirmity in Ms. Kennedy's victim impact statement, which was read to the jury in the penalty phase.  In the statement, Ms. Kennedy described Amanda's unique qualities as a mother and a friend, as well as the traumatic effects of her death (especially to Amanda's two children).  The disputed sentence—"Please think about Amanda and all of the lives she has blessed."— comes at the very end of the statement.  Colley complains that this statement (to which he lodged a timely objection) "inserted a religious obligation to the jury" and unconstitutionally tainted the jury's sentencing recommendation.  He implausibly maintains that Ms. Kennedy's words were "highly inflammatory."  We disagree.  The challenged statement was entirely innocuous and did not come close to prejudicing Colley's constitutional rights.  *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) (test is whether victim impact evidence is so "unduly prejudicial" as to render the trial "fundamentally unfair").

## VI.    Prosecutor's Comments

Colley next alleges constitutional injury stemming from two unobjected-to comments during the State's penalty phase closing argument.  We review such claims for fundamental error, defined as error that reaches down into the validity of the trial itself to the extent that the jury's recommendation of death could not have

- 27 -

been obtained without the assistance of the alleged error.  *Smiley v. State*, 295 So. 3d 156 (Fla. 2020).  We do not examine each of the allegedly improper comments in isolation.  Rather we look at the argument as a whole (including any objected-to statements) to determine whether the cumulative effect of any impropriety deprived the defendant of a fair penalty phase.  *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001).

First, Colley challenges the prosecutor's statement about the jury's role: "It is a job that requires great courage."  In full context, this is what the prosecutor said:

> The choices that he made for his own selfish desires because he couldn't let things go, because he was losing control, and this was the only way that he could regain control.
>
> Now, your job is a – nobody is going to put it lightly.  It's going to be a difficult job.  Nobody envies the job you're being asked to do in this particular case.  It is a solemn one, but it is an important one.  It is a job that requires great courage.  So what is your role today in this phase of the trial?
>
> It all starts with the law.  Now, it is true and I'm sure the defense will tell you when they get up here, that there will be no requirement at any point in time, legally, that you return a verdict for the death penalty.  However, it is the law.  And we talked about this during this jury selection, and each of you agreed and took an oath that you would do that.  You would consider, you would consider in this case, the death penalty.  You also said you would consider life without the possibility of parole.  And so I'd like to spend some time with you, talk to you first about your role in this particular case, and then talk to you about the law that applies in this particular case and sort of how you go about looking at the evidence that the State has

- 28 -

presented to you in this case and how to weigh the difference pieces of evidence.

Colley likens the challenged statement to telling the jurors not to "tak[e] the easy way out," which this Court found improper in *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998).

We see no similarity between the prosecutor's statement here and the one in *Urbin*. Here the prosecutor referred to "great courage" in the context of the jurors' duty to follow the law. By contrast, the prosecutor in *Urbin* told the jury: "[M]y concern is that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and mitigating circumstances and not want to fully carry out your responsibility and just vote for life . . . I'm going to ask you not to not to be swayed by pity or sympathy." *Id*. at 421. Nothing about the prosecutor's argument in this case suggested to the jury that a vote for life would be a copout.

Colley's second challenge is to this statement, made near the end of the State's penalty phase closing argument:

> He may have had a right to be upset, but not like this, not like this. The defendant was on a mission. Whatever he thought about Amanda Colley, he was not the judge, jury, and executioner of her character. That was not his job. What she did was – did not deserve a death sentence. What he did, in shooting her down the way he did and shooting Lindy Dobbins and killing her, that does deserve a death sentence.

Colley suggests that this argument inflamed the jurors' passions and encouraged them to base their recommendation on illegitimate considerations. We disagree.

- 29 -

As we have explained, one of the defense's principal themes in mitigation was to argue that Colley suffered from emotional strain and upset as a result of being estranged from his wife. In its guilt phase closing argument, the defense suggested that Amanda herself bore partial responsibility for Colley's fragile mental state, because she allegedly had lied to him about dating Lamar Douberly and led Colley on. Defense counsel said: "She kept bringing him back in and not allowing him to move on." And: "[I]t was this emotional roller coaster, back and forth, back and forth, that led to these terrible, terrible events." Against this backdrop, the prosecutor's statements simply anticipated Colley's mitigation argument and properly argued the State's theory of Colley's culpability. We see no violation of Colley's constitutional right to a fair trial and reject the argument that the State sought a verdict on a non-evidentiary ground.

## VII. Sufficiency of the Evidence

Finally, even where the defendant does not challenge the sufficiency of the evidence, this Court has a mandatory obligation in death penalty cases to determine whether competent, substantial evidence supports a murder conviction. *Kirkman v. State*, 233 So. 3d 456, 469 (Fla. 2018); Fla. R. App. P. 9.142(a)(5). That standard is easily satisfied in this case.

As to each victim, Colley was convicted of both premeditated and felony murder, and the convictions can be upheld on appeal if the evidence is sufficient to

support either theory. *Rogers*, 285 So. 3d at 891. Rachel Hendricks testified that she saw Colley in the backyard with a gun shooting into the house and that he entered Amanda's home through the shattered glass doors. She also said that Colley followed his murder victims into the master bedroom and that she saw him raise his gun to Lindy Dobbins' head. Uniquely colored bullets found in Colley's bedroom matched the ones found inside both murder victims' bodies. And already we have explained that Colley's actions—including arming himself in advance, approaching Amanda's home in a manner calculated to avoid detection, and shooting into the house from outside without any provocation—show not just premeditation but heightened premeditation. Competent, substantial evidence overwhelmingly supports Colley's two first-degree murder convictions.

## CONCLUSION

We affirm Colley's convictions for first degree murder and his sentences of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

In light of this Court's decision in *Lawrence v. State*, 45 Fla. L. Weekly S277 (Fla. Oct. 29, 2020) (receding from proportionality review requirement in death penalty direct appeal cases), and for the reasons expressed in my dissent in *Lawrence*, *id.* at S279-82, I can only concur in the result.

An Appeal from the Circuit Court in and for St. Johns County,
Howard M. Maltz, Judge - Case No 552015CF001248XXAXMX

James S. Purdy, Public Defender, Steven N. Gosney and George D.E. Burden, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Patrick Bobek, Assistant Attorney General, Daytona Beach, Florida,

for Appellee